In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3531

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE G. ROSALES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 11-CR-244-1-JPS—**J.P. Stadtmueller**, *Judge*.

ARGUED MAY 1, 2013—DECIDED MAY 22, 2013

Before BAUER, POSNER, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. Section 3B1.1(a) of the U.S. Sentencing Guidelines increases by four levels the guidelines range for a defendant who is found to be an organizer or leader of criminal activity in which there were at least five participants. (If he is found just to be a manager or supervisor, the increase is only three levels. See section 3B1.1(b).) The defendant was a member of a six-man gang of thieves that stole trucks

from truck yards and sold the cargoes to fences. The question presented by the appeal is whether he was the leader or organizer of the gang. The district court ruled that he was and so increased his base offense level by the four levels, which raised his guidelines range from 41 to 51 months to 63 to 78 months for conspiring to transport, and transporting, stolen motor vehicles and goods in interstate commerce. 18 U.S.C. §§ 371, 2312, 2314. The judge imposed a below-guidelines sentence of 58 months.

Application Note 4 to section 3B1.1 states that "in distinguishing a leadership and organizational role from one of mere management or supervision . . . the court should consider" factors that "include [and thus are not necessarily exhausted by] the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." As with most multifactor tests, the application note's seven-factor test is none too clear. No weighting of the factors is indicated (so really the "multifactor test" should be called a "list of factors"). And a majority of the factors are vague or redundant. That is true of "the nature of [the defendant's] participation in the commission of the offense," "the degree of participation in planning or organizing the offense," "the nature and scope of the illegal activity," and even "the degree of control and

authority exercised over others." For what is the difference between "control" and "authority"? And for that matter is there a difference between a "leader" and an "organizer"? The phrase "a leadership and organizational role" appears to fuse them.

Years ago a footnote in *United States v. Mustread*, 42 F.3d 1097, 1104 n. 3 (7th Cir. 1994), pointed out that the seven-factor test "contributes to the murk surrounding review of § 3B1.1 adjustments. For example, 'the nature of participation in the commission of the offense,' is distractingly vague, at best. In essence, it begs the question, because the ultimate inquiry is 'the nature of participation.'" The court did add (out of politeness to the Sentencing Commission?) that "taken together, however, the seven factors can provide valuable guidance"—but it gave no illustration and immediately added "that slavish adherence to them is unnecessary: the ultimate question is what relative role the defendant played." Slavish adherence, found in many opinions dealing with section 3B1.1, produces meandering, inconclusive opinions.

Still further uncertainty is injected by the reference to leader or organizer, and to the provision distinguishing both from a manager or supervisor (what's the difference?), who receives only a three-level enhancement. We noted in *United States v. Figueroa*, 682 F.3d 694, 695 (7th Cir. 2012), the oddity "that the same factors should be thought to identify a leader and a supervisor—the CEO of a supermarket chain, who is certainly a 'leader,' but in addition to him the head of the produce

department at one of the chain's supermarkets, who is merely a 'supervisor.' A low-level supervisor does not 'exercise . . . decision making authority,' though virtually any employee has to make some decisions (for example, whom to wait on first, if he is a store clerk). The low-level supervisor has no claim to a share in the 'fruits' of the enterprise and probably no hiring authority ('recruitment') either. And he does little in the way of 'planning' or 'organizing.'"

The apparent equation of "organizer" to "leader" is another oddity. The "organizer" of an entire enterprise would usually be thought the person who had started it; he might not be running it; he might not be a leader. A "manager" or "supervisor" might be the enterprise's leader.

All this is terribly confused, and could use further attention from the Sentencing Commission. It might make more sense just to ask whether the defendant was the boss of the criminal enterprise (4-level enhancement) or the boss of a subdivision of it (3 levels) than to trudge through the seven factors (and maybe others, since the seven factors are not exhaustive). Our defendant likes the seven-factor test, however; he pounces on one of the clearer factors in it—"the claimed right to a larger share of the fruits of the crime." For the proceeds of the thefts were split equally among the gang's members. But it is not all that unusual for a boss to be paid no more than, and even less than, a subordinate. A star salesman may be paid more than the sales manager to whom he reports. A hospital's star surgeons

often are paid more than the hospital's administrator, and the head coach of a college athletic team often is paid more than the athletic director to whom he reports. In a small firm, or a small gang, the profits may be split evenly because if one member were paid more than the others there mightn't be enough left over to induce them to remain, or because a subordinate might have specialized skills that were scarcer than the boss's skills.

Two of the members of the gang in this case were mechanics who could break into trucks and hot-wire them so they could be driven even though the drivers would not have the ignition key or remote. These were skills the defendant lacked. Two other gang members drove the trucks to the lots at which the cargoes were sold to the fences. The drivers were at greater risk of arrest than the defendant—they were driving stolen trucks containing stolen cargoes.

The defendant and his brother, the remaining members of the gang, had the contacts with the fences and arranged the transactions with them. The question is whether the defendant was also the gang's boss. He could have been, yet also have been constrained to split the profits evenly six ways; maybe otherwise he couldn't have roped in the mechanics, with their specialized skills, and the drivers, with their higher risk of arrest. So despite the even split of profits, to which his lawyer devotes much of her argument, the defendant may have been the boss. It would help if the record revealed whether he had started the criminal enterprise, but it does not.

The judge decided that the defendant was indeed the boss, because he had "brought all of this together, whether it's finding drivers, whether it's steering the co-conspirators to particular terminal yards, to particular types of products, and then your finding suitable fences whether here or over in Michigan, or elsewhere, to take these goods, that's what your role in all of this is more than amply demonstrated to have been." The defendant responds that really all this just followed from his being the contact person with the fences (his brother's role was similar but apparently quite minor); that he just conveyed to the other gang members the fences' "orders" (what kind of cargoes they wanted) and where the fences wanted the stolen cargoes delivered.

But his role as contact person *made* him the gang's leader, or so the judge could find. The defendant used his information about what the fences wanted to find unguarded truck yards containing trucks likely to contain cargoes that the fences would buy, to direct the other members to those truck yards, and to tell them (after consultation with the fences) which trucks in the yards to steal and where to deliver the cargoes to the fences. The fences paid him for the cargoes and he split the money among the gang's members (including himself). So he was the paymaster. He brought his brother and one other person (a driver) into the gang, so was a recruiter, and he searched out warehouse space in which to store stolen merchandise to await directions from the fences. Without him or someone in his position the gang would have fallen apart. The

gang needed a leader in order to function, and he was the leader.

 AFFIRMED.