**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 19-15168
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

BYRAMJI MONECK JAVAT,
LUIS ALBERTO SOTO,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cr-20668-DMM-1
_____

_____

No. 20-11137
_____

2                    Opinion of the Court                    19-15168

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

BYRAMJI MONECK JAVAT,
LUIS ALBERTO SOTO,

*Defendants-Appellants.*

————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cr-20668-DMM-1
————————————

————————————

No. 21-13593
————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

BYRAMJI MONECK JAVAT,

*Defendant,*

CALH HOLDING CORP.,
PENNCO, LLC,

*Intervenors-Appellants.*

—————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cr-20668-DMM-1

—————————————

Before ROSENBAUM, NEWSOM, and LUCK, Circuit Judges.

LUCK, Circuit Judge:

Byramji Javat and Luis Soto participated in a fraudulent discount scheme. Javat told manufacturers that he was going to sell goods abroad, including to the United States military in Afghanistan. Based on that representation, the manufacturers sold him goods at a steep discount. But it was a lie. Javat never supplied goods to the military and none of the goods were sold overseas. Instead, once he secured the discounts, he sold the goods in the United States for a substantial profit. Luis Soto was Javat's logistics partner who exported the goods overseas, imported them back to the United States, forged documents to clear the goods with United States Customs and Border Protection, and hid the goods' final destination from the manufacturers.

Javat and Soto were convicted and sentenced for their roles in this scheme. They appeal their convictions, sentences, restitution, and forfeiture on numerous grounds. And two of Javat's companies—Calh Holding Corporation and Pennco, LLC—appeal the district court's order dismissing their challenge to the forfeiture of two properties.

After careful consideration, we affirm Javat's and Soto's convictions and sentences, as well as the district court's restitution and

forfeiture orders.  But we remand for the limited purpose of correcting clerical errors in Javat's criminal judgment to incorporate the forfeiture order and money judgment.

## FACTUAL BACKGROUND

The scheme was simple.  Manufacturers generally sell wholesale goods at a lower price abroad than they do at home.  Javat tricked manufacturers to sell him goods at the lower price by lying.  Javat told them he was exporting goods to Afghanistan for use by the Afghan government and the United States military.  In reality, Javat sold the goods in the United States.  That allowed him to undercut the manufacturers on price and still make a profit on the difference.  Luis Soto was a customs broker who helped Javat divert the goods into the United States by sending them to Dubai and then importing them back into the United States through Miami.  He also falsified import documentation and Customs forms to keep the manufacturers in the dark.

The key to the scheme was a difference in how manufacturers price goods for the domestic market and the export market.  At home, manufacturers front the costs of warehousing, marketing, sales, compliance, and other overhead.  These costs are absorbed into the domestic wholesale price.  Manufacturers sell to wholesalers, wholesalers sell to distributors, distributors sell to retailers, and retailers sell to consumers.  With so many steps along the way, margins are thin—wholesalers, for example, often make only two to five percent on each sale.

Abroad, the picture is different.  When a manufacturer sells to a foreign dealer, the dealer usually absorbs overhead costs like warehousing, marketing, sales, and compliance.  That means manufacturers can charge much lower wholesale prices for goods sold exclusively outside the United States.  Manufacturers also want to grow their international markets, giving them a further incentive to keep prices low.  The result is that the export price is often half as much as the domestic wholesale price.  Naturally, manufacturers will only offer this discounted price if they know goods will be sold abroad—otherwise buyers could undercut manufacturers on their home turf.

That's exactly what Javat did.  Javat operated a wholesale company that purchased goods—including medical supplies, pharmaceuticals, and food products—and sold them to distributors in the United States.  Javat and his employees told manufacturers that his company supplied goods to the Afghan government and the United States military in Afghanistan, shipping them via Dubai.  Based on that representation, manufacturers gave Javat steeply discounted export-only prices, and some manufacturers agreed to even lower below-cost prices because they wanted the opportunity to provide goods to the United States military and its efforts in rebuilding Afghanistan.

Of course, none of this was true.  Javat's company didn't sell any goods abroad, let alone to the United States military or to the Afghan government.  In reality, Javat's company shipped the goods to Javat's warehouse in Calhoun, Georgia.  Javat then resold the

goods to distributors in the United States, offering lower prices than the manufacturers while making larger profits than he could have buying at the domestic wholesale price.

Unsurprisingly, Javat went to great lengths to keep up the ruse. To hide the scheme from the manufacturers, Javat and his employees created fake documents to give his lies the air of truth. These documents went into "excruciating detail" to help the manufacturers "swallow th[e] story." They explained where the goods went in Afghanistan, what the goods were being used for, identified the specific buildings where the goods were being used, and even displayed the Afghan government's official letterhead. Javat and his employees also created "dummy" bills of lading showing that the goods were being sent to Afghanistan via Dubai.

To hide the scheme from distributors and retailers, Javat made the goods look like they were intended for the domestic market. He and his employees told the manufacturers to package the goods for domestic use because the United States military was using the goods. To ensure consistency, Javat directed his employees to remove any indication that the goods were for export only. They altered labels, changed packaging, and removed export-only stickers so the retailers wouldn't catch on.

But some manufacturers wanted proof that the goods were actually being exported via Dubai. So Javat needed someone to coordinate sending the goods to Dubai and diverting them back to the United States while clearing Customs without giving up the scheme.

That's where Luis Soto entered the picture. Soto was a Miami customs broker and Javat's "logistics partner." Soto had extensive experience clearing goods through the Port of Miami. He even had experience diverting goods meant for export back into the United States. In those earlier schemes, he removed all export-only packaging and tracking devices from the goods, and then diverted the goods back into the domestic market.

Soto helped export Javat's goods to Dubai and reimport them through Miami. To clear the goods through Customs, Soto filed false documents and misled Customs officials by misrepresenting what the goods were and where they originated. Once he cleared the goods, Soto arranged to have them sent from Miami to Javat's Georgia warehouse. In exchange for his services, Javat paid Soto double the normal rate for a customs broker.

Eventually, some manufacturers and the government found out about the scheme. That's when the scheme ended and the court proceedings began.

## PROCEDURAL BACKGROUND

Because the district court proceedings were lengthy and complicated, we'll first give an overview of the procedural background and then we'll supplement with more detail as we discuss the issues.

The government charged Javat and Soto with four federal crimes: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. section 1349; (2) wire fraud, in violation of 18 U.S.C.

section 1343; (3) conspiracy to obtain pre-retail medical products by fraud, in violation of 18 U.S.C. section 670(a)(6); and (4) pre-retail medical product theft, in violation of 18 U.S.C. section 670(a)(1).

Javat and Soto moved to dismiss the wire fraud and conspiracy to commit wire fraud charges, arguing that the indictment failed to state an offense. After the district court denied the motion, Javat pleaded guilty to the wire fraud conspiracy.

Soto went to trial. At trial, the district court made several rulings relevant to this appeal. First, over Soto's objection, the district court allowed the government to introduce three sets of emails under Federal Rule of Evidence 404(b) showing that Soto helped past clients divert export goods back into the domestic market. The district court also excluded one of Soto's expert witnesses, a customs attorney who would have testified that Soto's actions did not violate any Food and Drug Administration regulations, that engaging in "gr[a]y market" transactions was not inherently illegal, and that manufacturers can protect themselves from diversion. At the close of the government's case, the district court denied Soto's motion for a judgment of acquittal, which argued that there was insufficient evidence to establish his knowledge that the scheme was fraudulent. The jury found Soto guilty on all charges. Soto renewed his motion for judgment of acquittal on the same grounds, which the district court also denied.

Javat and Soto proceeded to sentencing. The district court first determined that the loss amount under the United States

19-15168                 Opinion of the Court                 9

Sentencing Guidelines was $36.5 million based on the average discount Javat received from the usual domestic price, resulting in a twenty-two-level guideline enhancement. For Javat and Soto, the district court also applied a two-level enhancement because the offense involved ten or more victims, and a four-level enhancement because the offense involved conduct described in 18 U.S.C. section 670.[1] For Javat, the district court added a two-level enhancement for misrepresenting that he was acting on behalf of a government agency. And for Soto, the district court imposed a two-level enhancement for using his special skill as a customs broker when committing the offenses, and declined his request for a minor role reduction.

With the enhancements, Javat's advisory guideline range was 324 to 405 months and Soto's was 210 to 262 months. The district court granted them downward variances. It sentenced Javat to 120 months' imprisonment and Soto to 72 months' imprisonment.

Then the district court held a restitution hearing. Javat objected that the government had not given him adequate notice of which manufacturers were seeking restitution and asked to continue the hearing. The district court found that although Javat did have adequate notice for some of the manufacturers, he did not

---

[1] Section 670 prohibits, among other things, obtaining a "pre-retail medical product" by fraud or deception. 18 U.S.C. § 670(a)(1). "Pre-retail medical product" means "a medical product that has not yet been made available for retail purchase by a consumer." *Id.* § 670(e)(1).

have sufficient information or notice to address the restitution requests for a handful of other manufacturers. The district court therefore set a second restitution hearing to allow Javat to address the restitution requests for which he hadn't received adequate notice. Separately, Javat objected that 18 U.S.C. section 3664 did not permit the government to collect and present its own evidence at a restitution hearing.

Roughly two weeks before the second hearing, Javat served subpoenas on the remaining manufacturers asking them to deliver documents about transactions they had with other distributors and to produce witnesses to give live testimony about how each manufacturer calculated its restitution request. The district court quashed the subpoenas as untimely. After the restitution hearings, the district court ordered that Javat and Soto were jointly and severally liable for $29,021,243.29 in restitution to fifteen manufacturers. As with the loss amount, the district court calculated the restitution (over Javat's objection) by comparing the average discount Javat received with the full retail price of the goods.

Along with restitution, the district court also ordered forfeiture of $26,272,279.45 against Javat and entered a money judgment. Javat raised several objections—all overruled—including that: (1) forfeiture was improper because Javat's indictment cited the wrong forfeiture provision; (2) the district court violated the requirements of Federal Rule of Criminal Procedure 32.2 by not adequately incorporating its forfeiture orders into Javat's criminal judgment; (3) the government did not adequately trace the

proceeds of the fraud to Javat; and (4) the court was not authorized to enter a money judgment. Javat's criminal judgment did not incorporate the forfeiture orders.

As part of the district court's forfeiture order, it designated the Georgia warehouse and a Washington, D.C., condominium controlled by Javat as substitute forfeiture assets. Non-parties Calh Holding Corp. and Pennco, LLC—the respective record title owners of the Georgia and Washington properties—filed petitions to contest the substitute asset forfeiture in ancillary proceedings. The district court dismissed the petitions after finding that Calh and Pennco were straw owners for Javat's benefit and therefore lacked standing to challenge the forfeiture.

Javat and Soto appeal their final amended criminal judgments and sentences, and Calh and Pennco appeal the dismissal of their petitions.

## DISCUSSION

For ease of discussion, we divide the issues on appeal into four groups: pretrial and trial proceedings; sentencing; restitution; and forfeiture. For each issue, we first provide some additional background and then analyze it.

### I.    Pretrial and Trial Proceedings

We start with the pretrial and trial proceedings that led to Javat's and Soto's convictions. There are four issues on appeal: (1) the denial of the motion to dismiss; (2) the district court's admission of the government's rule 404(b) evidence against Soto;

(3) the district court's exclusion of Soto's expert's testimony; and (4) the sufficiency of evidence for Soto's conviction.  We address these issues in turn.

### A.    The Motion to Dismiss

Javat and Soto challenge the district court's denial of their motion to dismiss because they say the indictment did not allege a scheme to defraud.[2]

### 1.    Background

The indictment alleged that Javat and Soto engaged in a scheme to "defraud" in which they obtained "goods at deeply discounted prices . . . by falsely and fraudulently representing" to manufacturers that they would export the goods "when, in fact, [they], from the outset, intended to, and did in fact, sell those goods" within the United States.  Javat and Soto moved to dismiss the wire fraud and conspiracy to commit wire fraud charges, arguing that their alleged scheme did not economically harm the manufacturers and thus was not an illegal scheme to defraud covered by the fraud statutes.  Drawing on a distinction we made in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), *abrogated by Kousisis v. United States*, 605 U.S. 114 (2025), they contended that the

---

[2] We review a district court's "denial of a motion to dismiss an indictment for abuse of discretion," *United States v. Webster*, 127 F.4th 318, 321 (11th Cir. 2025), but "[w]hether a criminal statute reaches a defendant's conduct is reviewed *de novo*," *United States v. Lopez-Vanegas*, 493 F.3d 1305, 1311 (11th Cir. 2007) (citing *United States v. Calhoon*, 97 F.3d 518, 523–24 (11th Cir. 1996)).

indictment charged a legal scheme to deceive because the manufacturers received exactly what they bargained for—the money they agreed to exchange for their goods.

The district court denied the motion to dismiss. It explained that the alleged scheme harmed the manufacturers because they could have charged the far higher domestic wholesale price absent the misrepresentations. Because the manufacturers were harmed by lost profits, the district court concluded that the alleged scheme was properly charged as an illegal scheme to defraud.

## 2.    Analysis

As they did in the district court, Javat and Soto argue that the scheme alleged in the indictment was a legal scheme to deceive under *Takhalov*, rather than an illegal scheme to defraud, because the manufacturers received all the money they were promised in exchange for their goods. But since Javat unconditionally pleaded guilty, he waived his challenge to the indictment. Regardless, the challenge fails on the merits because the indictment successfully alleged an illegal scheme.

"[A]n unconditional guilty plea . . . waive[s] non-jurisdictional defects in the proceedings . . . ." *United States v. Tomeny*, 144 F.3d 749, 751 (11th Cir. 1998). A defect in the indictment is jurisdictional only if it affects the district court's subject matter jurisdiction. *See United States v. Leonard*, 4 F.4th 1134, 1142 (11th Cir. 2021). Because district courts have subject matter jurisdiction over "all offenses against the laws of the United States," 18 U.S.C. § 3231, a jurisdictional defect arises "when an indictment fails to charge an

14                    Opinion of the Court                    19-15168

offense against [the laws of] the United States," *Leonard*, 4 F.4th at 1142. That only occurs in one of three ways: (1) when the indictment charges the defendant with "a crime that . . . did not exist in the United States Code"; (2) when the alleged conduct "undoubtedly fell outside the sweep of" a federal criminal statute; or (3) when the indictment alleges "a violation of a regulation that was not intended to be a 'law' for purposes of criminal liability." *United States v. Brown*, 752 F.3d 1344, 1353 (11th Cir. 2014).

Here, Javat does not raise a jurisdictional defect under any of those three ways. There was no jurisdictional defect under either the first or third way because the indictment charged Javat with conspiracy to commit wire fraud, in violation of 18 U.S.C. section 1349—a "crime that . . . exist[s] in the United States Code" and imposes "criminal liability." *See id.*; 18 U.S.C. § 1349 (imposing criminal "penalties" on defendants convicted of conspiracy to commit wire fraud).

And there was no jurisdictional defect under the second way because the indictment alleged conduct that was within "the sweep of" section 1349. *See Brown*, 752 F.3d at 1353. Section 1349 prohibits conspiring to engage in a "scheme . . . to defraud" by "obtaining . . . property by means of false . . . representations." 18 U.S.C. §§ 1343, 1349. The indictment alleged prohibited conduct by stating that Javat conspired with Soto and others to "defraud" manufacturers by obtaining "goods at deeply discounted prices . . . by falsely and fraudulently representing" to the manufacturers that he would export their goods. Because this alleged conduct did not fall

outside the scope of the fraud statute, his challenge to the district court's denial of his motion to dismiss was nonjurisdictional and waived by his unconditional guilty plea. *See Tomeny*, 144 F.3d at 751.

Javat resists that conclusion, arguing that his challenge raises a jurisdictional defect because the indictment failed to allege conduct that falls "within the sweep" of section 1349. He analogizes the indictment here to the one in *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002). But *Peter* is inapposite.

In *Peter*, the indictment charged the defendant with mail fraud by alleging that he conspired to fraudulently obtain alcoholic beverage licenses. *Id*. at 711. After the defendant pleaded guilty, the Supreme Court held in another case that fraudulently obtaining licenses was not within the sweep of the mail fraud statute. *Id*. at 711–12 (discussing *Cleveland v. United States*, 531 U.S. 12 (2000)). Because the indictment "affirmatively alleged a specific course of conduct that [wa]s outside the" sweep of the mail fraud statute, the district court lacked subject matter jurisdiction to accept the defendant's guilty plea. *Id*. at 715.

Here, the indictment did not affirmatively allege a specific course of conduct that the Supreme Court held was outside the scope of the wire fraud conspiracy statute. Javat's indictment alleged that he conspired with others to engage in a scheme to "defraud" the manufacturers by obtaining "goods at deeply discounted prices . . . by falsely and fraudulently representing" that the goods were for export. That's plainly within the sweep of the wire fraud conspiracy statute, which prohibits conspiring with

others "to defraud" by "obtaining . . . property by means of false . . . representations." *See* 18 U.S.C. §§ 1343, 1349.

Javat counters that his case is like *Peter* because the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), shows that his conduct falls outside the wire fraud conspiracy statute. But *Ciminelli* has nothing to do with the conduct alleged in Javat's indictment. There, the Supreme Court held that a deprivation of the right to control the use of another's assets is not a property interest that can "form the basis for a conviction under" the federal fraud statutes. *Id.* at 316. Here, nothing in the indictment "affirmatively alleged" that Javat deprived the manufacturers of their right to control the goods. *See Peter*, 310 F.3d at 715.

In any case, even if Javat did not waive these arguments by pleading guilty, they fail on the merits. In *Takhalov*, we held that the wire fraud statute "forbids only schemes to *defraud*" and "not schemes to do other wicked things, *e.g.*, schemes to lie, trick, or otherwise deceive." 827 F.3d at 1310. We explained that an illegal scheme to defraud requires the defendant "to use deception to cause some injury," while a legal scheme to deceive uses deception "without intending to harm at all." *Id.* at 1312.

The problem for Javat is that the Supreme Court, in *Kousisis*, rejected the distinction we made in *Takhalov*. *See* 605 U.S. at 121 (citing *Takhalov*, 827 F.3d at 1312–14). In *Kousisis*, the defendant secured a government contract based on false representations that he would use a disadvantaged business for part of the project. *Id.* at 119. In fact, the disadvantaged business in the defendant's bid was

fake, and the defendant had a non-disadvantaged business do the work instead. *Id.* A jury convicted the defendant of wire fraud, and he appealed, arguing that the wire fraud statute could not support a conviction where the victim was not economically injured by the false statement. *Id.* at 120. The Supreme Court affirmed the conviction and held that a scheme to deceive violates the wire fraud statute "regardless of whether [the fraudster] seeks to leave the victim economically worse off." *Id.* at 124. The Court rejected our approach in *Takhalov* because the wire fraud statute does not contain any language indicating an "economic-loss requirement." *Id.* at 123. Instead, the Court explained, the wire fraud statute only requires the defendant to "(1) 'devise' . . . a scheme (2) to 'obtain money or property' (3) 'by means of false or fraudulent pretenses, representations, or promises.'" *Id.* (alterations adopted) (quoting 18 U.S.C. § 1343).

That's exactly what the indictment alleged here. It stated that Javat and Soto devised a scheme to obtain the manufacturers' "goods at deeply discounted prices . . . by falsely and fraudulently representing" that the goods were for export only. Because those allegations amount to a violation of the wire fraud statute, *see id.*, the district court did not err in denying the motion to dismiss.

### B.    *The Government's Rule 404(b) Evidence*

As the next pretrial issue, Soto contends that the district court erred in denying his motion to exclude the government's rule 404(b) evidence showing that Soto previously helped a

18                     Opinion of the Court                    19-15168

distributor conceal diversion because the evidence was irrelevant and substantially more prejudicial than probative.[3]

### 1.    Background

Before trial, the government gave Soto notice that it intended to introduce two individual emails and another email chain as evidence of prior acts under rule 404(b).  In the first email, a distributor told Soto he had "some goods" from domestic "suppliers" and wanted to divert the goods to domestic "customers."  To do so without the suppliers knowing, the distributor asked Soto to remove "delivery notes" and "labels with addresses" from the goods' packaging, to "open[] and check[]" "every single case" to ensure there were no "tracking devices," and then to ship the goods to the distributor's domestic customers.  In the second email—sent just two weeks after the first one—Soto wrote he "ha[d] a customer" that needed "special services for cargo," including "remov[al]" of "any documents . . . attached to" the cargo and "[s]earch[ing] for tracking devices" in "every single case."  His email then asked for a quote for these services.

In the final email chain, which was sent several months after the first two, the same distributor instructed Soto to check again for tracking devices on an incoming shipment of goods.  Soto responded to confirm that the distributor wanted him to do "all this very costly work" as he did for the earlier shipment.  In describing

---

[3] We review for abuse of discretion a district court's decision to admit evidence under rule 404(b).  *United States v. Brown*, 587 F.3d 1082, 1091 (11th Cir. 2009).

the earlier shipment, Soto explained that the goods had to be exported overseas and then reimported "because [the distributor] needed to show proof of exportation."

Soto moved to exclude the emails for two reasons. First, he argued that the emails were irrelevant to whether Soto knew about Javat's scheme to defraud the manufacturers in this case. Second, he asserted that the emails were substantially more prejudicial than probative given that the jury could think that this "unrelated product diversion transaction" violated federal criminal law.

The government responded to both reasons. As to the first one, the government argued that the emails were relevant to show that Soto had "complete awareness" that his clients were lying to their suppliers about exporting their goods and Soto knowingly helped them cover it up by generating false export documents. As to the second reason, the government maintained that the emails' probative value far outweighed any unfair prejudice because the main issue in Soto's trial was whether he knew about and intentionally engaged in Javat's scheme and the emails provided strong evidence that Soto knew that his clients were deceiving manufacturers about where their goods were going. The district court agreed with the government and denied Soto's motion to exclude the emails.

To mitigate any prejudice, the district court gave a limiting instruction about the emails at trial. Specifically, the district court told the jury that it could not consider the emails "to decide if [Soto] engaged in the activity alleged in the [i]ndictment" but that

it could only "consider th[e] evidence to decide whether [Soto] had the state of mind or intent necessary to commit the crime charged in the indictment."

## 2.    Analysis

Rule 404(b) is a rule "of inclusion which allows extrinsic evidence [of prior bad acts] unless it tends to prove only criminal propensity." *United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (citation modified) (quoting *United States v. Stephens*, 365 F.3d 967, 975 (11th Cir. 2004)).  Under rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  But the evidence is "admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. R. 404(b)(2).

"For evidence of other crimes or acts to be admissible under [r]ule 404(b)," it must meet three requirements.  *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).  First, the evidence "must be relevant to an issue other than [the] defendant's character."  *Id*.  Second, "there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question."  *Id*.  And third, the evidence must be admissible under rule 403, meaning "the probative value of the evidence cannot be substantially outweighed by undue prejudice." *Id*.

Here, the emails met the three admissibility requirements. As to the first requirement, the emails were "relevant to" show that Soto knew about Javat's fraudulent scheme and intentionally engaged in it. *Id.* Specifically, the emails showed that Soto previously exported and then reimported goods for a distributor so that the distributor could have "proof of exportation." The emails also showed that Soto removed labels and delivery notes and searched for and removed tracking devices for this distributor so that the distributor's domestic suppliers would not know the goods were reimported.

Similarly, Javat's fraudulent scheme involved exporting and then reimporting goods so that Javat could have proof of exportation to support his false representation to the manufacturers that the goods were destined for Afghanistan. And Javat's scheme also involved altering packaging to ensure that his domestic retailers would not find out about his scheme. Because the emails showed that Soto knew about and intentionally engaged in a scheme that was materially identical to Javat's scheme, the emails were relevant to show that Soto knew his actions were intended to deceive the manufacturers and that he intentionally engaged in Javat's scheme. *See United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) ("A similarity between the other act and a charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense.").

As to the second requirement, the emails gave "sufficient proof to enable [the] jury to find by a preponderance of the

evidence" that Soto knew about and intentionally engaged in the earlier scheme. *See Edouard*, 485 F.3d at 1344. In the first email, the distributor told Soto that he had goods from domestic suppliers and needed to direct them to domestic customers. To do so without the suppliers or customers knowing, the distributor told Soto to remove labeling and delivery notes and to search for tracking devices from the goods' packaging. In the second email, Soto confirmed that he had a customer needing "special cargo services," including removing labeling and delivery notes and searching for tracking devices. And in the final email chain, Soto said the purpose of the earlier request was to give the distributor "proof of exportation," even though the goods were going to the distributor's domestic customers.

As to the third requirement, the emails' probative value was not "substantially outweighed by undue prejudice." *Id*. Whatever prejudice flowed from the emails was minimized by the district court's limiting instruction that told the jury to consider the emails "to decide whether [Soto] had the state of mind or intent necessary to commit the crime charged in the indictment" but not "to decide if [he] engaged in the activity alleged in the [i]ndictment." *See United States v. Perry*, 14 F.4th 1253, 1275 (11th Cir. 2021) ("[L]imiting instructions about the proper way to consider 404(b) evidence . . . reduce[] the risk of undue prejudice."). Soto put his knowledge and intent to engage in Javat's scheme as the central, if not only, issue at trial by pleading not guilty, by moving for judgment of acquittal based on insufficient evidence of knowledge and intent, and by asserting to the jury in closing argument that there

was insufficient evidence of those elements. *See United States v. McNair*, 605 F.3d 1152, 1203 (11th Cir. 2010) ("In every conspiracy case, a not guilty plea renders the defendant's intent a material issue." (citation modified)). The emails showing Soto's knowledge and intent were highly probative in this case, and outweighed any lingering prejudice after the instruction was given. Because the three requirements were met, the district court did not err in denying Soto's motion to exclude the government's rule 404(b) evidence. *See Edouard*, 485 F.3d at 1344.

Even so, Soto contends that the emails were inadmissible hearsay. Soto is mistaken. Hearsay—an out-of-court statement offered to prove the truth of the matter asserted—is generally inadmissible. *See* Fed. R. Evid. 801(c), 802. But an opposing party's statement is not hearsay. Fed. R. Evid. 801(d)(2). Likewise, a statement by a non-testifying declarant embedded in a conversation with an opposing party is not inadmissible hearsay if it is offered to show the statement's effect on the opposing party. *See, e.g.*, *Perry*, 14 F.4th at 1273–74 (finding that statements by a non-testifying declarant in conversation with the defendant were not hearsay because they "were offered to show their effect on" the defendant). Here, Soto's statements were admissible because they were made by an opposing party and his correspondents' statements were admissible because they were offered for their effect on Soto rather than for their truth. *See id.*; Fed. R. Evid. 801(d)(2)(A).

24                        Opinion of the Court                    19-15168

### C.        *Soto's Expert Testimony*

In the third issue, raised at trial, Soto argues that the district court abused its discretion in excluding his proposed expert's testimony.[4]

### 1.        Background

As part of his defense, Soto sought to call a customs attorney as an "expert on FDA importing." Soto proffered that the expert would testify that the reimportation of goods into the United States did not violate any FDA regulations, that engaging in "gr[a]y market" transactions was not necessarily illegal, and that manufacturers can protect themselves against diversion risk by exporting goods themselves or by rendering their goods non-compliant with FDA regulations (for example, by labeling goods in the language of the country to which the product is intended for export).

The government moved to exclude the expert's testimony, arguing: (1) it was inadmissible under rule 401 because it was irrelevant to any material fact in the case; (2) it was inadmissible under rule 403 because it was confusing and misleading; (3) it was inadmissible under rule 404(b) because evidence that Soto complied with FDA regulations was impermissible "good acts" evidence as Soto was not charged with violating any regulations; (4) it was inadmissible under rule 702's requirements for expert testimony because it was "unhelpful" to the jury; and (5) it impermissibly sought

---

[4] We review for abuse of discretion the exclusion of expert witness testimony. *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018).

to "blame the victims"—the manufacturers—for failing to prevent diversion.

The district court agreed with the government and granted the motion to exclude Soto's expert's testimony. The district court found that the expert's testimony was irrelevant, that it would likely cause jury confusion because Soto's compliance with Customs or FDA requirements was not part of the government's case, that it was akin to impermissible good acts evidence, and that the testimony impermissibly blamed the victims.

### 2.    Analysis

The district court did not abuse its discretion in excluding Soto's expert because his testimony was irrelevant. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Under rule 401, evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *Id.* R. 401.

Here, the government charged Soto with knowingly participating in Javat's scheme to defraud manufacturers by representing that the goods would be sold overseas to obtain lower export pricing and then selling the goods for a substantial profit in the United States, undercutting the manufacturers. The government never argued that Soto violated FDA regulations or that his participation in gray market transactions was necessarily illegal, so whether Soto complied with FDA regulations or whether gray market transactions could be conducted legally had no bearing on whether he knowingly participated in the scheme to defraud. The expert's

testimony that manufacturers can protect themselves from diversion was likewise irrelevant to whether Soto intentionally defrauded the manufacturers.  In a fraud case, the relevant question is "the intent of the malefactor, not the reasonableness of the victim[.]"  *United States v. Svete*, 556 F.3d 1157, 1162 (11th Cir. 2009) (citing *Durland v. United States*, 161 U.S. 306, 315 (1896)).  For this reason, "[t]he negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct." *Id.* at 1167 (quoting *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995)).

Because the expert's testimony was not relevant, it also flunked rule 702's requirements.  Rule 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  But since no part of the expert's testimony was relevant to a material fact in Soto's case, it failed to meet rule 702's helpfulness requirement.  *See id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citation modified)).

Soto responds that the expert's testimony was relevant to Soto's knowledge and intent "of the offenses charged because it showed that a broker's knowledge that he/she was handling gray market goods was not a 'red flag' that they were obtained through a scheme to defraud or fraudulently obtained as charged in the indictment."  According to Soto, this testimony was necessary to rebut a government witness—one of his coconspirators—who

testified that there was no legitimate purpose for engaging in the gray market.

There are two problems with Soto's argument. First, it mischaracterizes the coconspirator's testimony. The coconspirator testified that there was no legitimate purpose in exporting and then immediately reimporting goods because doing so would incur significant additional costs for no commercial reason. He did not testify that there was no legitimate purpose to gray market transactions in general or that such transactions were inherently illegal. Second, Soto never proffered to the district court that the expert's testimony would show that handling gray market goods was not a "red flag" that the goods were obtained through a scheme to defraud.

Soto also contends that the district court's exclusion of his expert's testimony violated his constitutional right to present a complete defense under the Fifth and Sixth Amendments. Relying on our decision in *United States v. Hurn*, 368 F.3d 1359 (11th Cir. 2004), Soto argues that the Constitution required the district court to allow his expert's testimony to combat the government's evidence that Soto knew about and intentionally engaged in Javat's fraudulent scheme.

In *Hurn*, we explained that the Fifth Amendment's right to "due process of law" and the Sixth Amendment's right to "have compulsory process for obtaining witnesses in [a defendants'] favor" require "that criminal defendants must be afforded the opportunity to present" a complete defense. *See id.* at 1362 (citation

modified); *see also United States v. Mitrovic*, 890 F.3d 1217, 1221 (11th Cir. 2018) (explaining that the Constitution ensures that defendants have "a meaningful opportunity to present a complete defense" (citation modified)).  We also provided a two-part test to analyze whether a defendant's conviction should be reversed for violating the right to a complete defense.  *See Hurn*, 368 F.3d at 1362–63.  Under that test, "[w]e first examine whether this right was actually violated, then turn to whether this error was 'harmless beyond a reasonable doubt.'"  *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).  If the defendant's constitutional claim fails under either step, his conviction stands.  *See id.* at 1363; *see also United States v. Pon*, 963 F.3d 1207, 1228 (11th Cir. 2020) (affirming a defendant's conviction because, even assuming a violation of the defendant's right to a complete defense, the constitutional error "was harmless beyond a reasonable doubt").

Under the first part of the test, we have made clear that "a defendant's right to present a complete defense is not absolute[] and is subject to reasonable restrictions." *Mitrovic*, 890 F.3d at 1221 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  These reasonable restrictions allow "state and federal rulemakers" to have "broad latitude . . . to establish rules excluding evidence from criminal trials." *Scheffer*, 523 U.S. at 308.  Indeed, "the Supreme Court . . . has never held that a federal rule of evidence violated a defendant's right to present a complete defense." *Mitrovic*, 890 F.3d at 1221–22 (emphasis omitted).  And we have "never overturned a district court's proper application of a [f]ederal [r]ule of [e]vidence" as a violation of a defendant's right to present a complete defense.

*Id.* at 1222; *see also United States v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004) (en banc) ("[W]hile a criminal defendant must be given every meaningful opportunity to present a complete defense, in doing so he must comply with the procedural and evidence rules designed to facilitate a search for truth.").

Soto's constitutional claim fails under the first part of the *Hurn* test. The district court properly excluded the expert's testimony under the rules of evidence because Soto did not state a basis for concluding it was relevant and helpful to the jury. *See* Fed R. Evid. 401, 702(a). As we explained above, the coconspirator did not testify that there was no legitimate purpose to gray market transactions in general or that such transactions were inherently illegal. And Soto never proffered to the district court that the expert would testify that handling gray market goods was not a "red flag" that the goods were obtained through a scheme to defraud.

### D.    Sufficiency of the Evidence as to Soto

As the final trial issue, Soto argues that the district court erred in denying his motion for judgment of acquittal because the evidence was insufficient to establish that Javat's pricing scheme defrauded manufacturers or that Soto had knowledge of the scheme.[5]

---

[5] We review de novo the sufficiency of the evidence when the defendant has preserved his claim by moving for judgment of acquittal. *United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015). In doing so, "[w]e examine 'whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder,

### 1.    Background

After the government rested its case, Soto moved for judgment of acquittal on two grounds.  First, Soto argued that he was entitled to a judgment of acquittal because the evidence showed that Javat's scheme was a legal scheme to deceive, rather than an illegal scheme defraud, given that the manufacturers were paid the amount they agreed to sell their goods.  Second, he asserted that he was entitled to a judgment of acquittal because there was insufficient evidence for a reasonable jury to conclude that he knew about or intentionally engaged in Javat's scheme.  The district court denied Soto's motions.

After Soto rested his case, the jury entered a guilty verdict on all counts.  He then renewed his motion for judgment of acquittal on the same grounds.  The district court denied the renewed motion.

### 2.    Analysis

#### i.    *The Illegal Scheme*

Soto first contends that the evidence was insufficient to show that the scheme was an illegal scheme to defraud.  This argument fails for the same reasons as Soto's challenge to the district

---

would enable the trier of fact to find the defendant guilty beyond a reasonable doubt.'"  *Id.* (quoting *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989)).

court's denial of his motion to dismiss: the scheme was illegal both as charged and as supported by the evidence.

To convict a defendant of a wire fraud conspiracy, the government must prove beyond a reasonable doubt that the defendant conspired with another person to commit wire fraud. *See* 18 U.S.C. § 1349. And to convict a defendant of wire fraud, the government must prove beyond a reasonable doubt that the defendant "(1) 'devis[ed]' . . . a scheme (2) to 'obtai[n] money or property' (3) 'by means of false or fraudulent pretenses, representations, or promises.'" *Kousisis*, 605 U.S. at 123 (quoting 18 U.S.C. § 1343).

Here, there was sufficient evidence for a reasonable jury to conclude Soto and Javat schemed to "obtain . . . property by means of false . . . representations." *Id.* at 123. The government presented evidence from five manufacturers—Sklar Corporation, Andover Corporation, Parkell, Inc., Bayer AG, and DeMet's Candy Company—that supplied Javat's company with consumer goods at discounted prices on the belief that the goods were destined for Afghanistan. Representatives from four of the companies—Sklar, Andover, Parkell, and Bayer—testified at Soto's trial and told the same story. They testified that Javat or someone from his wholesaling company represented to them that Javat's company supplied goods to the United States military in Afghanistan or the Afghan government. The representatives explained that they sold Javat goods at steeply discounted export-only prices—far lower than their domestic wholesale prices—which they would never have offered had they known that Javat planned to sell the goods in the

United States.  One of Javat's coconspirators testified that none of the goods went to Afghanistan and instead Javat, with Soto's help, exported the goods to Dubai and reimported them right back into the United States to sell at a substantial profit.

The story was the same for the fifth manufacturer, DeMet's Candy.  Javat's employees told DeMet's Candy that they supplied an Afghan relief agency—Afghanistan Reconstruction and Development Services—and that DeMet's Candy was "requested to share the best economical prices to win this business."  DeMet's Candy agreed to sell goods to Javat's company "at a discount below usual pricing of [p]roducts to domestic customers" but only "upon condition that [the p]urchaser agreed" that any products would "be exported exclusively to . . . Afghanistan" and that the company would not divert the products back into the United States.  Later, DeMet's Candy learned that the goods it sold to Javat's company at a "discounted price" were being diverted "to one of [its] major [U.S.] customers," which was "costing [DeMet's Candy] a lot of time and money."  It informed Javat's employees of the issue and asked them to provide documents proving the goods ended up in Afghanistan, but they gave DeMet's Candy the runaround, claiming they were not allowed to provide these documents.

Soto, citing the Ninth Circuit's decision in *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), argues that this evidence established only that the scheme deprived the manufacturers of their ability to control the destination of the goods they sold, which is not a violation of the wire fraud statute.  But *Bruchhausen* is

inapplicable here. For one thing, the Supreme Court abrogated *Bruchhausen* in *Kousisis* just as it did *Takhalov* because fraud does not require an economic injury. *See Kousisis*, 605 U.S. at 121 (citing *Bruchhausen*, 977 F.2d at 467–68). For another thing, the evidence in Soto's case showed that Javat did not pay full price for the goods thanks to his lies, which even the *Bruchhausen* court found was a fraud. *See Bruchhausen*, 977 F.2d at 467 (noting that the victim manufacturers were not "defrauded of 'property' within the meaning of the [wire fraud] statute" because they "received the full sale price for their products" and therefore "clearly suffered no monetary loss"); *see also* 18 U.S.C. § 1343.

### ii.  *Soto's Knowledge and Intent*

Next, Soto argues that the district court erred in denying his motion for judgment of acquittal and motion for new trial because there was insufficient evidence he knowingly or intentionally engaged in Javat's scheme. This argument also fails because the evidence was sufficient that Soto had knowledge and intent to engage in Javat's scheme to defraud the manufacturers.

The government presented the emails from Soto's earlier scheme, showing that Soto knew that practices like falsifying import documentation of reimported goods were intended to deceive manufacturers. And the government presented evidence of Soto's role in the scheme. A coconspirator testified that Soto was Javat's trusted logistics partner who exported the goods to Dubai and reimported the goods through Miami so that Javat could have proof of exportation. The coconspirator explained that Javat and Soto

initially exported goods to Dubai because this was consistent with the story they told the manufacturers—that the goods were destined for Afghanistan.  They reimported the goods through Miami—even though it was more expensive to use than other ports—because that was the port Soto knew best and where the goods had the best chance of clearing Customs.  Further, the coconspirator testified that there was no legitimate purpose to export and immediately reimport goods because doing so would incur significant additional costs for no commercial purpose.  For his role in the scheme, Soto earned double the amount a customs broker would normally earn.

Soto's emails with Javat confirmed that he knew about the nature of Javat's scheme.  One email chain showed that Soto knew Javat obtained goods from a manufacturer and needed the goods exported and reimported without the manufacturer knowing.  In another email chain, Soto and his coconspirators discussed doctoring a bill of lading while the goods were being shipped overseas.  In that exchange, Soto told his coconspirators that the bill of lading should show that the goods were going to Dubai because "this is where the supplier believes [the] cargo is going."

Finally, the government presented evidence that Soto lied to Customs to get the goods cleared through Miami.  Soto told Customs that the reimported goods were "over stocked products from suppliers overseas who[] purchase products from different manufacturers and in many cases from [the United States.]"  He also falsely told Customs that "we were not the original exporter from

[the United States] and we have no way of getting proof of the original exportation of [the] good[s] now being re-imported." On another occasion, Soto directed other coconspirators to identify the manufacturers' facility number issued by the FDA so that Soto could use that information on Customs forms when reimporting the goods through Miami. But Soto made clear to the coconspirators that they could not request this information from the manufacturers because this would cause them to discover that the goods were being reimported.

In sum, the evidence showed that Soto knew how to create false proof of exportation to further an illegal scheme to defraud, that Soto created false proof of exportation to further Javat's illegal scheme to defraud, and that he knew to hide that the proof of exportation he created was false so Javat's illegal scheme could continue. When viewing this evidence in the light most favorable to the jury's verdict, there was sufficient evidence for a reasonable jury to conclude that Soto had knowledge of and intentionally engaged in Javat's scheme to defraud the manufacturers.

## II.    Sentencing

We now move to Javat's and Soto's issues with their sentences. They raise six issues on appeal. Javat and Soto argue that the district court erroneously applied: (1) a twenty-two-level enhancement based on the loss amount; (2) a two-level enhancement because the offense involved ten or more victims; and (3) a four-level enhancement because the offense involved conduct described in 18 U.S.C. section 670. Javat also argues that the district court

36                    Opinion of the Court                    19-15168

erroneously applied (4) a two-level enhancement for misrepresenting that he was acting on behalf of a government agency. And Soto contends that the district court (5) erroneously applied a two-level enhancement for using a special skill during the offense; and (6) should have granted him a minor role reduction. We address each issue in turn.

### A.    The Loss-Amount Enhancement

First, Javat and Soto argue that the district court erred in calculating the loss amount using lost profits instead of out-of-pocket loss.[6]

### 1.    Background

The United States Probation Office prepared presentence investigation reports for Javat and Soto. The probation office determined that the loss amount was $84,660,587.08 because Javat's company purchased $84,660,587.08 worth of goods and, on average, received a fifty-percent discount on those goods, depriving the manufacturers of $84,660,587.08 in additional profits. Because the loss amount was between $65 million and $150 million, the probation office enhanced Javat's and Soto's base offense levels by twenty-four.

---

[6] We review de novo a district court's interpretation and application of the sentencing guidelines, and we review for clear error its finding about the loss amount. *United States v. Stein*, 846 F.3d 1135, 1151 (11th Cir. 2017).

Javat and Soto objected that lost profits were not the correct measure of loss. They asserted that the correct measure was out-of-pocket loss—that is, the purchase price minus the cost of production. And because the manufacturers made a profit, they had no out-of-pocket loss, so no enhancement should apply.

The district court agreed with the probation office that lost profits were a valid measure of loss. But the district court pointed out that the probation office had mistakenly calculated the loss amount using sales from 2008 to 2018, whereas the indictment charged that the conspiracy was ongoing from March 2014 to October 2017. The district court therefore determined that the correct loss amount was $36,500,321.83 because Javat's company purchased $36,500,321.83 worth of goods and received a fifty-percent average discount during the charged conspiracy period, depriving the manufacturers of $36,500,321.83 in additional profits. And since the loss amount was between $25 million and $65 million, the district court enhanced Javat's and Soto's base offense levels by twenty-two. *See* United States Sentencing Guidelines § 2B1.1(b)(1)(F) (Nov. 2018).

## 2.    Analysis

The district court did not clearly err in determining the loss amount because lost profits were a valid method for calculating loss caused by a fraudulently obtained discount where the evidence shows that the lost profits represent the pecuniary harm to the victim. "In a fraud case," the sentencing guidelines provide for enhancements based on "the loss resulting from the offense." *United*

*States v. Annamalai*, 939 F.3d 1216, 1235 (11th Cir. 2019) (citing U.S.S.G. § 2B1.1(b)(1)))." The "legal cause standard we use under [section] 2B1.1(b) is reasonable foreseeability." *Stein*, 846 F.3d at 1155. "Because 'often the amount of loss caused by fraud is difficult to determine accurately,' a [district] court can use a 'reasonable estimate' of the loss." *Annamalai*, 939 F.3d at 1235 (quoting *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007)).

Using lost profits to calculate the loss amount is "entirely commensurate with the degrees of loss that [defendants] reasonably expected to occur." *United States v. Marti-Lon*, 524 F.3d 295, 302 (1st Cir. 2008). Fraudulently obtained discounts deprive the victim "of the opportunity to sell th[e] same [goods] at a non-discounted price." *Id.* That's why several of our sister circuits have held that using lost profits caused by a fraudulently obtained discount is a valid loss calculation method as a reasonable measure of the pecuniary harm to victims. *See United States v. White*, 846 F.3d 170, 179 (6th Cir. 2017) (finding that the district court's determination of loss was not "outside the universe of acceptable computations" when the victim "airlines used standard ticket-auditing practices to determine the difference between the fares [the defendant] obtained fraudulently and the next-cheapest fare possible"); *United States v. Farano*, 749 F.3d 658, 665 (7th Cir. 2014) ("The defendants argue that HUD lost nothing because it would have sold the properties at a discount to someone else. The argument is unsound. HUD was led to believe that it was buying something of value to it for the amount of the discounts, namely low- and moderate-income housing; and the defendants stole the money, thus depriving

HUD of a thing of value that had been promised."); *United States v. Ali*, 620 F.3d 1062, 1073–74 (9th Cir. 2010) (finding no error when the "district court relied upon spreadsheets, created by IRS agents, that approximated the difference between the full retail price of the software sold by [d]efendants and the . . . price [d]efendants paid for it"); *Marti-Lon*, 524 F.3d at 301–02.

Here, the manufacturers' testimony at Soto's trial showed that they suffered a financial loss because they discounted their goods by fifty percent or more based on the fraudulent misrepresentations that the goods were for export. Accounting records from coconspirators indicated that Javat's company purchased $36,500,321.83 worth of goods during the charged conspiracy period and received a fifty-percent average discount on those goods based on the fraudulent representations. By giving away a fifty-percent average discount on those goods, the manufacturers lost approximately $36,500,321.83 in profits. This evidence gave the district court a "sufficient basis" to estimate the "loss caused by" the scheme at $36,500,321.83. *Annamalai*, 939 F.3d at 1237.

Citing our decision in *Stein*, Javat and Soto reject this conclusion, arguing that the government didn't prove the discounts were a result of fraud. In *Stein*, we vacated the defendant's sentence in a securities fraud case because the record did not sufficiently establish that the purported victims relied on the defendant's fraudulent statements and the district court failed to consider the possibility that intervening circumstances contributed to the loss. *See Stein*, 846 F.3d at 1155–56. But here, unlike in *Stein*, the

record showed that the manufacturers relied on the misrepresentations to offer the discounts.  And Javat and Soto have not pointed to any intervening circumstances that caused the manufacturers' losses.[7]

### B.      The Victim Enhancement

As their next sentencing issue, Javat and Soto argue that the district court erred in finding that the scheme involved ten or more victims.[8]

### 1.      Background

In calculating Javat's and Soto's sentences, the probation office enhanced their base offense levels by two because the scheme involved ten or more victims.  *See* U.S.S.G. § 2B1.1(b)(2)(A)(i).  Javat and Soto objected to this enhancement because the record did not reflect that ten or more victims were harmed.

At the sentencing hearing, the government presented evidence showing the scheme involved ten or more victims.  First, the

---

[7] Javat and Soto finally contend that the district court improperly rejected as untimely Javat's request to issue subpoenas seeking the manufacturers' transaction and pricing records.  Javat moved for the district court to issue subpoenas under Federal Rule of Criminal Procedure 17 six days before his sentencing hearing.  "The issuance of subpoenas under [rule] 17 is within the trial court's discretion, and timeliness is one of the factors the trial court may consider." *United States v. Perez-Tosta*, 36 F.3d 1552, 1556 n.2 (11th Cir. 1994).  We find no abuse of discretion in the district court's call that Javat's request was untimely.

[8] We review for clear error the district court's calculation of the number of victims.  *See United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013).

government relied on the evidence from Soto's trial showing that five manufacturers—Andover, Bayer, Parkell, Sklar, and DeMet's Candy—gave Javat's company discounts based on the fraudulent misrepresentations about where the goods were going. Next, the government presented Javat's emails advertising to potential buyers that his company previously sold goods from five other manufacturers—"Convatec, 3M, Braun, Bard, [and] Biogel Gloves"—and that he could offer "significant cost savings" on goods due to his "procurement strategies." Third, the government provided Javat's company's "deal profitability sheets," which identified six more manufacturers from which Javat received large discounts—Horiba Medical, Pascal International, Splenda, Storck Candy, Surgical Specialties, and Whip Mix. And finally, the government submitted shipping reports showing that Javat's company shipped goods from nearly thirty more manufacturers during a six-month period in 2017.

## 2.    Analysis

The government provided sufficient evidence for the district court to find that Javat's and Soto's offenses involved ten or more victims. Section 2B1.1(b)(2)(A)(i) imposes a two-level enhancement when the defendant's offense "involved [ten] or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). The number of victims is a question of fact that the government must prove by a preponderance of the evidence. *See Rodriguez*, 732 F.3d at 1305. The number of victims must be supported by "reliable and specific evidence." *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995). When

42                    Opinion of the Court                19-15168

making this finding, the district court can "make reasonable infer-
ences from the evidence." *United States v. Matthews*, 3 F.4th 1286,
1289 (11th Cir. 2021) (citations omitted).

The evidence from Soto's trial established that five manufac-
turers—Andover, Bayer, Parkell, Sklar, and DeMet's Candy—gave
Javat's company discounts based on Javat's misrepresentations
about where the goods were going to be sold.  And Javat's com-
pany's "deal profitability sheets" identified six more manufactur-
ers—Horiba Medical, Pascal International, Splenda, Storck Candy,
Surgical Specialties, and Whip Mix—that also gave large discounts
to Javat's company.  Javat's advertising emails established his com-
pany offered goods from "Convatec, 3M, Braun, Bard, [and] Biogel
Gloves" at "significant cost savings" due to Javat's company's "pro-
curement strategies."  This evidence was both reliable and specific,
*Lawrence*, 47 F.3d at 1566, and it identified more than ten manufac-
turers that suffered a loss.

In addition, the government presented weekly shipping re-
ports maintained by Javat's company that showed the conspirators
handled goods from nearly thirty more manufacturers in 2017.
Considering the evidence that demonstrated the scheme's procure-
ment methods, the district court made a "reasonable inference[]"
that these manufacturers offered discounted goods based on simi-
lar misrepresentations.  *See Matthews*, 3 F.4th at 1289.

C.      *The Pre-Retail Medical Product Theft Enhancement*

Third, Javat and Soto argue the district court clearly erred in
applying the enhancement for pre-retail medical product theft.

### 1.    Background

The probation office recommended a four-level increase to Javat's and Soto's base offense levels because their offenses involved conduct described in 18 U.S.C. section 670 and they were each agents or employees of an organization in the supply chain of a pre-retail medical product.  *See* U.S.S.G. § 2B1.1(b)(8)(B).  Javat and Soto objected.  Javat argued that this enhancement did not apply to him because he did not plead guilty to a section 670 offense, that making misrepresentations to obtain a lower price on products did not constitute obtaining the products by fraud, and that he was not an employee or agent of a company in the supply chain of a pre-retail medical product.  Soto joined Javat's objection, which the district court overruled.

### 2.    Analysis

The district court properly applied the enhancement for pre-retail medical product theft.  The enhancement has three elements.  First, the offense must "involve[] conduct described in 18 U.S.C. [section] 670," U.S.S.G. § 2B1.1(b)(8)(B), which makes it unlawful to obtain pre-retail medical products by fraud or deception, *see* 18 U.S.C. § 670(a)(1).  Second, the defendant must be "employed by, or . . . an agent of, an organization."  U.S.S.G. § 2B1.1(b)(8)(B).  And third, the organization must be "in the supply chain for the pre-retail medical product."  *Id.*

Javat met each element.  First, Javat obtained pre-retail medical products from manufacturers by fraud and deception, which is "conduct    described    in    18    U.S.C.    [section] 670."    U.S.S.G.

§ 2B1.1(b)(8)(B); *see also* 18 U.S.C. § 670(a)(1).  For example, a representative from Parkell, a medical-products manufacturer, testified at Soto's trial that Parkell sold Javat medical products based on his fraudulent misrepresentations that the products were for export, and he testified that Parkell would not have sold Javat the products had Parkell known they were not for export.  Second, Javat, because he owned and operated it, was "an agent of" his wholesaling company.  *See* U.S.S.G. § 2B1.1(b)(8)(B).  And third, Javat's wholesaling company sold pre-retail medical products to retailers and, thus, it was "in the supply chain for the pre-retail medical product."  *Id.*

Javat counters that he does not meet the first element because he did not plead guilty to a section 670 offense.  But section 2B1.1(b)(8)(B) does not require a conviction under section 670 for the enhancement to apply.  *See id.*  It only requires that a defendant's offense "involve[] conduct described in 18 U.S.C. [section] 670."  *Id.*  Other provisions of section 2B1.1, on the other hand, explicitly provide that they apply only when a defendant was convicted of the cited offense.  *See id.* § 2B1.1(b)(6) (enhancement applies when "the defendant was convicted of an offense under 18 U.S.C. [section] 1037"); *id.* § 2B1.1(b)(13) (enhancement applies when "the defendant was convicted under 42 U.S.C. [sections] 408(a), 1011(a), or 1383a(a)").  We assume "the [s]entencing [c]ommission . . . acts intentionally when it uses particular language in one section but omits it in another."  *United States v. Dupree*, 57 F.4th 1269, 1278 (11th Cir. 2023) (en banc) (citation modified).  Unlike the other provisions in the fraud guideline,

19-15168                Opinion of the Court                      45

section 2B1.1(b)(8)(B) requires only that a defendant's offense involve conduct described in section 670. And here, Javat's offense did involve conduct described in section 670, so he met the first element.

Next, he asserts that he does not meet the second element because he was the owner of his wholesaling company, and not its "agent." *See* U.S.S.G. § 2B1.1(b)(8)(B). An agent is "someone who is authorized to act for . . . another." *Agent*, Black's Law Dictionary (12th ed. 2024). Javat was clearly an "agent of" his wholesaling company because he was "authorized to act for" the company. *Id*. He admitted at his change-of-plea hearing, for example, that he contacted the manufacturers himself and negotiated with them on his company's behalf.

Finally, Javat argues that he did not meet the third element because the "supply chain" for pre-retail medical products is statutorily defined to include vendors and their agents and not buyers like his company. But that distinction is nowhere in section 670's text. Instead, section 670 explicitly provides that "the term 'supply chain' includes . . . wholesaler[s]." 18 U.S.C. § 670(e)(6). Javat's company was a "wholesaler" that purchased goods directly from manufacturers and resold the goods to retailers, *see id.*, so his company was "in the supply chain for pre-retail medical product[s]," U.S.S.G. § 2B1.1(b)(8)(B).[9]

---

[9] Soto summarily joined Javat's challenges to any "applicable enhancements," but he did not make any specific argument that the district court misapplied the pre-retail medical products enhancement to him. And it did apply to him.

D.    *The Misrepresentation of Acting on Behalf of a Government Agency Enhancement*

Fourth, Javat argues that the district court erred in applying an enhancement for misrepresenting that he was acting on behalf of a charitable organization or government agency.

### 1.    Background

The probation office enhanced Javat's base offense level by two because he misrepresented that he was acting on behalf of a government agency.  *See* U.S.S.G. § 2B1.1(b)(9)(A).  Javat objected that the enhancement should not apply because the manufacturers knew that his company was a private, for-profit business.  The district court applied the enhancement over Javat's objection, explaining that Javat told the manufacturers that he was "acting on behalf of the [United States] military and [its] Afghan reconstruction effort."

### 2.    Analysis

The district court did not clearly err in finding that Javat misrepresented that he was acting on behalf of a government agency. Section 2B1.1(b)(9)(A) provides a two-level enhancement if the

Soto, unlike Javat, was convicted under section 670, so Soto's conduct was certainly "conduct described in 18 U.S.C. [section] 670" for purposes of the enhancement. U.S.S.G. § 2B1.1(b)(8)(B).  And, like Javat, Soto was an "agent" of Javat's company, which was "in the supply chain for the pre-retail medical product." *Id.*  Thus, the district court did not err in applying the enhancement to Soto.

defendant's "offense involved . . . a misrepresentation that the defendant was acting on behalf of a charitable [or] educational . . . organization . . . or a government agency." *See* U.S.S.G. § 2B1.1(b)(9)(A).

When Javat pleaded guilty, he admitted that he "contacted various [manufacturers] under the false pretense of being a large supplier of medical, surgical and food products to the United States military stationed abroad" and that he misrepresented that the goods "would be distributed to, among others, the [United States] military abroad." At Soto's trial, the government presented evidence that Javat's company misrepresented to manufacturers that it supplied goods to the United States military, the Afghanistan Reconstruction and Development Services—an Afghan government agency "funded [and] managed by" the United States military—and the "Afghan National Army and Police Hospital." As part of the scheme, Javat's company sent forged documents to the manufacturers purporting to show the Afghan government soliciting bids for the manufacturers' goods.

In *Ellisor*, we held that similar evidence was sufficient to apply this enhancement. *See* 522 F.3d at 1275–76. There, the evidence showed that the defendant obtained a letter from a university using false pretenses, forged letters on university letterhead, and claimed the university hired him to coordinate an event. *Id.* That's what Javat did here. He forged Afghan government letters and misrepresented a relationship with the United States military. *See id.*

Javat responds that the enhancement did not apply because the manufacturers knew his company was a private, for-profit business.  But that misses the point.  Javat and his coconspirators misrepresented that Javat's company was working "on behalf of" the United States military and Afghan government.  Since Javat's offense "involved . . . a misrepresentation that the defendant was acting on behalf of . . . government agenc[ies]," the district court correctly applied the two-level enhancement.  *See* U.S.S.G. § 2B1.1(b)(9)(A).

### E.    The Special Skill Enhancement

Fifth, Soto argues that the district court erred in applying the special skill enhancement because serving as a customs broker is not a special skill.[10]

### 1.    Background

The probation office enhanced Soto's base offense level by three because he used a "special skill" as a customs broker to "facilitate[] the commission or concealment of" his offense.  U.S.S.G. § 3B1.3.  Soto objected.  He pointed to the guideline commentary, which provided examples of occupations that required special skills, including "pilots, lawyers, doctors, chemists[,] and demolition experts."  *See id.* cmt. n.4.  The enhancement did not apply, he

---

[10] We review de novo "the district court's legal interpretation of the term 'special skills,'" but we review for clear error a finding that the defendant possessed the special skill.  *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1219 (11th Cir. 2010).

argued, because customs brokers do not have the same special skills as these examples. But because customs brokers had to know the applicable regulations for clearing goods, pass a technical exam, and be licensed by Customs, the district court applied the enhancement over Soto's objection.

## 2.  Analysis

The district court did not err in finding that Soto exercised a special skill as a customs broker as part of the fraud scheme. Section 3B1.3 provides a two-level enhancement when a defendant "used a special skill[] in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G § 3B1.3. A "special skill[]" is "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *United States v. Calderon*, 127 F.3d 1314, 1339 (11th Cir. 1997) (quotation omitted). In other words, a skill is special "[i]f an 'average person off the street' does not possess" it. *De La Cruz Suarez*, 601 F.3d at 1219 (quoting *Calderon*, 127 F.3d at 1339).

Here, Soto used his skills as a customs broker to "significantly facilitate[] the commission or concealment of the offense." U.S.S.G. § 3B1.3. His role as Javat's customs broker was essential to the fraud scheme, as Soto was the one who exported and reimported Javat's goods without alerting Customs or the manufacturers. At his trial, for example, the evidence showed that Soto forged Customs documents to clear Javat's goods through the Miami Customs office and to "conceal" the fraudulent scheme from both Customs officials and the manufacturers. *See id.* And his customs

expert testified that to become a customs broker a person must be licensed by Customs and pass an exam on Customs regulations, the other relevant regulations for clearing cargo, the "transactional process of clearing cargo," and the other governing agencies that regulate particular cargo. As the district court found, this is not knowledge possessed by the "average person off the street." *See De La Cruz Suarez*, 601 F.3d at 1219 (quoting *Calderon*, 127 F.3d at 1339).

Soto counters that a customs broker's skills are not "special" because a customs broker does not require the same degree of "education, training or licensure" as the examples in the guideline commentary—"pilots, lawyers, doctors, accountants, chemists, and demotion experts." *See id.* cmt. n.4. But our focus is not on comparing a customs broker to other skilled jobs. The "focus of [our] inquiry is on the skills members of the public possess generally." *See Calderon*, 127 F.3d at 1339. Since "the average person off the street does not possess" a customs broker's license and the unique knowledge and training to receive one, the special skill enhancement was properly applied. *See De La Cruz Suarez*, 601 F.3d at 1219 (quoting *Calderon*, 127 F.3d at 1339); U.S.S.G. § 3B1.3. Plus, as we explained above, it was precisely because Soto was a customs broker that Javat needed him and sought him out.

F.      *The Minor Role Reduction*

Finally, in the last issue about his sentence, Soto contends that the district court clearly erred in denying his request for a minor role reduction.[11]

1.      <u>Background</u>

At the sentencing hearing, Soto argued that his base offense level should be reduced because he played a minor role in the scheme as there was no evidence showing he had a proprietary interest or decision-making authority.  The district court denied the request.

2.      <u>Analysis</u>

The district court did not clearly err in finding that Soto played more than a minor role in the fraud scheme.  Section 3B1.2(b) states that the district court should reduce the defendant's base offense level by two if it finds that the defendant "was a minor participant in any criminal activity."  *See* U.S.S.G. § 3B1.2(b).  "Two principles . . . guide . . . whether a defendant played a minor role in the criminal scheme:  (1) the defendant's role in the relevant conduct[;] . . . and (2) his role as compared to that of other participants in his relevant conduct."  *United States v. Cabezas-Montano*, 949 F.3d 567, 606 (11th Cir. 2020) (citation modified).  But "even if a defendant played a lesser role than the other participants, that fact

---

[11] A defendant's role in the offense is a finding of fact we review for clear error. *United States v. De Varon*, 175 F.3d 930, 937–38 (11th Cir. 1999) (en banc).

does not entitle [him] to a role reduction since it is possible that none are minor or minimal participants." *United States v. Martin*, 803 F.3d 581, 591 (11th Cir. 2015) (citation modified). "The defendant bears the burden of establishing, by a preponderance of the evidence, his minor role in the offense." *Cabezas-Montano*, 949 F.3d at 606 n.38.

Applying the two principles here, Soto did not play "a minor" role in the "criminal activity." *See* U.S.S.G. § 3B1.2(b). As to his role in the relevant conduct, Soto exported and reimported Javat's goods, forged Customs forms and shipping documents to conceal the scheme, advised coconspirators how to keep concealing the goods' final destination from the manufacturers, and eventually cleared the goods through Customs so that Javat could sell them at a massive profit in the United States.

As to Soto's role compared to others in his relevant conduct, Soto was "the primary, if not exclusive," customs broker and was Javat's trusted "logistics partner[]" who was consulted frequently on how to avoid alerting manufacturers that the goods were being reimported. His role in the relevant conduct was vital, even "compared to that of other" coconspirators in Javat's scheme. *Cabezas-Montano*, 949 F.3d at 606.

Soto responds that his role was minor because he did not make any misrepresentations to the manufacturers. But whether he personally lied to the manufacturers is irrelevant. Soto was essential to facilitating Javat's misrepresentations to the manufacturers. He was responsible for organizing the export and reimport of

the goods and furthered the scheme by falsifying shipping documentation and Customs forms. And Soto knew that Javat would show the falsified documentation that Soto created to the manufacturers. After all, that was the point. All of this conduct was critical in fooling the manufacturers into believing that the goods were actually being exported.

Soto also contends that he played a minor role in the scheme because he did not have a proprietary interest in the criminal activity or decision-making authority. But that's not correct. Soto was paid a premium—double the usual rate for a customs broker—to deceive the manufacturers. And he had decision-making authority over how to export and reimport the goods so they could get by Customs.

### III.    Restitution

Javat raises three challenges to the district court's restitution orders. He argues that: (1) the district court erred when it allowed the government to present its own evidence on the amount of restitution owed, in violation of 18 U.S.C. section 3664, and that denying his request for a continuance compounded the error; (2) the district court erred in quashing his subpoenas; and (3) the district court erred in its finding that he owed around $29 million in restitution to the manufacturers. Soto joins these arguments. We find no error.

### A.    *The Section 3664 Objection*

Javat and Soto argue that the district court violated 18 U.S.C. section 3664 because it allowed the government, rather than the probation office, to present evidence at the restitution hearings.[12]

### 1.    Background

The district court ordered the probation office to include restitution in Javat's and Soto's presentence reports. When the probation office prepared the reports, it didn't have complete restitution information, so the district court set the restitution hearing for a date after the sentencing hearing. Separate from the probation office, the government collected information and restitution requests from the manufacturers.

A week before the restitution hearing, the government filed a notice that it would seek restitution for nine manufacturers: Bayer, Parkell, Sklar, Andover, DeMet's Candy, Pascal, Galderma, Gojo, and Steris. A day before the hearing, the government filed amended notices identifying five more manufacturers: Convatec, Kraft, Purdue, Bard, and Surgical Specialties. Javat moved to continue the hearing, arguing that the government had only provided

---

[12] We review de novo the legality of a restitution order and review for clear error any factual findings supporting the order. *United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013). We review for abuse of discretion a district court's denial of a motion for continuance. *United States v. Valladares*, 544 F.3d 1257, 1261 (11th Cir. 2008).

him notice that it would seek restitution on behalf of Andover, Parkell, Bayer, DeMet's Candy, and Galderma.

The district court partly granted the motion. It granted the motion as to five manufacturers—Gojo, Convatec, Kraft, Surgical Specialties, and Bard—because Javat did not have sufficient information or notice to address their requests. The district court deferred ruling on those five manufacturers and scheduled a second restitution hearing. But the district court denied the motion as to nine manufacturers—Andover, Galderma, Bayer, Parkell, Sklar, DeMet's Candy, Pascal, Steris, and Purdue—and held a restitution hearing on those manufacturers' requests because Javat had adequate notice of their claims.

At the first restitution hearing, the probation office had not yet completed its separate restitution report for Javat, so the government requested permission to present its own restitution evidence. Javat objected, arguing the government could provide restitution evidence to the probation office, but could not present evidence during a restitution hearing. The district court overruled Javat's objection and allowed the government to present evidence about the nine manufacturers' requests for restitution.

At the second hearing, the district court considered the other five manufacturers' requests—plus the request of one additional company, Campbell—based on the probation office's completed investigation and restitution memorandum. The government also sought to present its own evidence on the requests, and Javat objected again. The district court heard the government's evidence

over Javat's objection and said it would consider both the probation office's memorandum and the government's evidence.

### 2.    Analysis

The district court did not err because section 3664 did not prevent the government from presenting evidence at the restitution hearings. Section 3663A "requires the district court to award restitution to identifiable victims of certain crimes, including crimes of fraud." *Martin*, 803 F.3d at 593 (citing 18 U.S.C. § 3663A(a)(1)). Restitution orders "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663A(d). Section 3664 provides that the district court "shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order." *Id.* § 3664(a). If the defendant disputes the amount owed to a victim, the government bears the burden of proving the victim's loss by a preponderance of the evidence. *See id.* § 3664(e).

Here, the district court satisfied section 3664. It ordered the probation office to prepare a "presentence report." *Id.* § 3664(a). And the probation office followed the district court's order by preparing a "separate report" on restitution. *Id.*

Javat and Soto disagree, arguing that the district court violated section 3664 because it allowed the government, rather than the probation office, to present evidence at the restitution hearings. But nothing in section 3664 precludes the government from presenting its own evidence in support of restitution. *See id.* § 3664.

Restitution is mandatory, *see id.* § 3663A(a), and the government bears the burden of proving a victim suffered a loss, *see id.* § 3664(e); *see also United States v. Williams*, 612 F.3d 500, 513 (6th Cir. 2010) (noting that "the government . . . ha[s] a *mandatory* obligation under the [Mandatory Victims Restitution Act] to seek the full . . . amount of the . . . victims' losses as restitution"). So the district court did not violate section 3664 by allowing the government to carry its burden by presenting evidence.

Javat and Soto also assert that the district court erred in denying them a continuance to address the manufacturers' restitution claims. But to reverse based on a denial of a continuance motion, they need to "show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice." *United States v. Jeri*, 869 F.3d 1247, 1257 (11th Cir. 2017) (quoting *United States v. Verderame*, 51 F.3d 249, 251 (11th Cir. 1995)). And to establish specific substantial prejudice, they had to "identify relevant, non-cumulative evidence that would have been presented if [the] request for a continuance had been granted." *Id.* (quoting *United States v. Saget*, 991 F.2d 702, 708 (11th Cir. 1993)). Javat and Soto failed to do so here.

The district court's denial of the continuance motion did not prejudice Javat or Soto because they had sufficient notice and information to assess the restitution requests of the nine manufacturers for which the district court denied the continuance. The government presented evidence relating to Andover, Bayer, Sklar, DeMet's Candy, and Parkell at Soto's trial and Javat was aware the

government would be seeking restitution for those manufacturers. In his motion for a continuance, Javat conceded he knew that Galderma requested restitution. He also received evidence related to Pascal's, Steris's, and Purdue's restitution requests a week before the restitution hearing. And Javat and Soto have not identified any noncumulative evidence they would have presented had the district court granted the continuance motion. *See id.*

### B.    The Motion to Quash Javat's Subpoenas

Next, as to restitution, Javat and Soto argue the district court abused its discretion in quashing the subpoenas Javat served on the manufacturers before the second restitution hearing.[13]

### 1.    Background

Between the two restitution hearings—about two months before the second hearing—the government provided Javat with the documents it intended to use as evidence to support the additional manufacturers' restitution requests. Nearly a month and a half later, just under two weeks before the second hearing, Javat served two subpoenas each on the six remaining manufacturers for a total of twelve subpoenas. These subpoenas requested the manufacturers to produce numerous documents about other transactions they had with other distributors and to produce a witness to give live testimony about how each manufacturer calculated its

---

[13] We review for abuse of discretion a district court's ruling on a motion to quash a subpoena. *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1326 (11th Cir. 2020).

restitution request.  The government moved to quash the subpoenas.  The district court granted the motion because compliance with the subpoenas would be unreasonable when Javat served them less than two weeks before the hearing despite having "ample opportunity" to serve the subpoenas after receiving the government's documents related to the relevant manufacturers.

2.    Analysis

Federal Rule of Criminal Procedure 17 grants district courts discretion to quash a subpoena when "compliance would be unreasonable or oppressive," Fed. R. Crim. P. 17(c)(2), including when the subpoena is untimely and there is little time for the subject to comply, *see Perez-Tosta,* 36 F.3d at 1556 n.2 (stating that timeliness is a factor when determining whether to issue a subpoena under rule 17); *United States v. Muho*, 978 F.3d 1212, 1219 (11th Cir. 2020) ("The appellate courts have upheld the refusal of district courts to issue a [r]ule 17(b) subpoena where the request was untimely . . . .").

Here, Javat served six manufacturers with two subpoenas each just two weeks before the second restitution hearing.  The subpoenas asked for a trove of documents about earlier transactions and for live testimony from witnesses.  Given the breadth of the request and the lack of time to comply, the district court did not abuse its discretion by quashing the subpoenas.  *See* Fed. R. Crim. P. 17(c)(2); *cf. Perez-Tosta*, 36 F.3d at 1556 n.2; *Muho*, 978 F.3d at 1219.

60                          Opinion of the Court                    19-15168

### C.    *The Restitution Amount*

Finally, as to restitution, Javat and Soto argue that the district court erred by incorrectly calculating the restitution amount based on lost profits.[14]

### 1.    Background

After the two restitution hearings, the district court concluded that the government's evidence and the probation office's restitution report were sufficiently reliable to award restitution to the fifteen manufacturers—Andover, Bayer, DeMet's Candy, Parkell, Sklar, Bard, Campbell, Convatec, Kraft, Galderma, Gojo, Pascal, Purdue, Steris, and Surgical Specialties.  The district court found that there was sufficient evidence—including sworn statements, invoices, spreadsheets, and other business records—to show that each manufacturer lost profits from the scheme because they would have sold the goods at full retail prices absent the misrepresentations about the goods' destination and that each manufacturer's loss calculation was reliable.  Based on this evidence, the district court ordered that Javat and Soto were jointly and severally liable for $29,021,243.29 in restitution to the fifteen manufacturers.

---

[14] We review "for clear error a factual finding regarding the specific amount of restitution." *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (citing *United States v. Foley*, 508 F.3d 627, 632 (11th Cir. 2007)).

2.    Analysis

Once a defendant has been convicted of an offense "in which an identifiable victim . . . has suffered a . . . pecuniary loss," the district court must grant the victim restitution. *See* 18 U.S.C. § 3663A(a), (c)(1)(B); *United States v. Goldman*, 953 F.3d 1213, 1223 (11th Cir. 2020). A "victim" includes any person who has "suffered a harm that directly and proximately results from the" defendant's offense. *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) (citation modified).

Calculating restitution is "largely the same" as calculating loss under the sentencing guidelines, *United States v. Cavallo*, 790 F.3d 1202, 1239 (11th Cir. 2015), because the district court can approximate the amount of restitution owed, *see United States v. Futrell*, 209 F.3d 1286, 1291–92 (11th Cir. 2000). Evidence used to estimate a restitution award "need not be sworn; it merely must bear sufficient indicia of reliability to support its probable accuracy." *United States v. Gatlin*, 90 F.4th 1050, 1075 (11th Cir. 2024) (citation modified).

Here, there was reliable evidence—including trial testimony, sworn statements, invoices, spreadsheets, and other business records—showing that the fifteen manufacturers collectively lost $29,021,243.29 in profits by giving Javat's company discounts based on the fraudulent misrepresentations about the goods' destination. Thus, the district court did not err in ordering Javat to pay the fifteen manufacturers $29,021,243.29 in restitution.

As with the loss amount, Javat and Soto argue that using fraudulently obtained discounts is not a permissible way to calculate restitution.  But section 3663A required Javat to pay the manufacturers restitution for those pecuniary losses that "proximately result[ed] from" his offenses.  *See Robertson*, 493 F.3d at 1334; *see also* 18 U.S.C. § 3663A.  Here, the evidence presented at the two restitution hearings showed that fifteen manufacturers lost $29,021,243.29 as a "proximate[] result[]" of Javat's fraudulent misrepresentations.  *See Robertson*, 493 F.3d at 1334.

Javat and Soto also contend that no evidence showed that the manufacturers' goods would have sold at their full retail price and, thus, there was insufficient evidence that the manufacturers lost $29,021,243.29 in profits.  But the district court was allowed to approximate the restitution amount.  *See Futrell*, 209 F.3d at 1291–92.  And the evidence showed that the manufacturers would not have discounted their retail prices absent Javat's fraud.  So, using the difference between the retail price and the amount Javat paid for the goods was a reasonable way to approximate the restitution in this case.  *See id.*

## IV.    **Forfeiture**

Javat raises four issues to challenge the district court's forfeiture orders:  (1) forfeiture was improper because Javat's indictment cited the wrong forfeiture provision; (2) the district court violated the requirements of Federal Rule of Criminal Procedure 32.2 by not adequately incorporating its forfeiture orders into the judgment; (3) the government did not adequately trace the proceeds of

the fraud; and (4) a money judgment was improper.  Calh and Pennco also appeal the district court's forfeiture of Javat's substitute property and the district court's dismissal of their petitions for lack of standing.  We take each argument in turn.[15]

### A.    The Indictment's Incorrect Citation

First, as to forfeiture, Javat argues that rule 32.2(a) required the government to cite the correct forfeiture statute in the indictment.  Because the government failed to do so here, he contends, the district court erred in ordering forfeiture.

### 1.    Background

Both Javat's original indictment and the superseding indictment alleged that, "[u]pon conviction," Javat was required to forfeit "all property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such violation" under 18 U.S.C. section 982(a)(2)(A).  Javat moved to dismiss the superseding indictment, arguing that the forfeiture allegation was defective because it cited section 982(a)(2)(A), which applies to proceeds from violations affecting a financial institution.  *See* 18 U.S.C. § 982(a)(2)(A).  In response, the government acknowledged the scrivener's error and explained that the indictment should have

---

[15] In reviewing forfeiture orders, we review de novo the district court's legal conclusions and review for clear error its findings of fact.  *United States v. Waked Hatum*, 969 F.3d 1156, 1161–62 (11th Cir. 2020).

64                    Opinion of the Court                    19-15168

cited section 981(a)(1)(C), which applies to proceeds from wire fraud. *See id.* § 981(a)(1)(C).

The district court denied the motion. It explained that the indictments and the government's acknowledgment of the error gave Javat sufficient notice that the proceeds from his fraud would be forfeited and that Javat was not "prejudiced by the incorrect statutory reference." Javat then pleaded guilty to conspiracy to commit wire fraud.

After Soto's trial, the government moved for forfeiture under section 981(a)(1)(C). Javat objected, arguing that rule 32.2(a) required the indictment to cite the correct forfeiture statute. Because the superseding indictment cited the wrong statute, Javat argued that the district court could not order forfeiture. He also opposed forfeiture under section 981(a)(1)(C) on the merits.

The district court overruled the procedural objection for the same reasons it denied the motion to dismiss: the indictments and the government's acknowledgment of error gave Javat sufficient notice of forfeiture and the error did not prejudice Javat. It deferred ruling on Javat's merits objections until after a forfeiture hearing could be held.

## 2.    Analysis

Rule 32.2(a) provides that "[a] court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment . . . contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in

accordance with the applicable statute." Fed. R. Crim. P. 32.2(a). The applicable forfeiture statute was section 981(a)(1)(C), which provides for forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. section 1956(c)(7)])." 18 U.S.C. § 981(a)(1)(C). Section 1956(c)(7)'s definition of "specified unlawful activity" includes wire fraud. *See id.* § 1957(c)(7) (defining "specified unlawful activity" as including "any act or activity constituting an offense listed in section 1961(1)"); *id.* § 1961(1) (listing wire fraud as a qualifying offense).

Assuming without deciding that rule 32.2(a) did require an exact citation, the government's error was harmless. Under rule 52(a), "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded" as harmless. Fed. R. Crim. P. 52(a). And here, Javat received notice that the government would seek forfeiture under section 981(a)(1)(C) well before he pleaded guilty because the government noted the incorrect citation in its response to Javat's motion to dismiss. The government also moved for forfeiture under the correct provision, and Javat had the opportunity to, and did, oppose that motion on the merits. Thus, the incorrect citation did not "affect" Javat's "substantial rights." *Id.*; *see also United States v. Farias*, 836 F.3d 1315, 1330 (11th Cir. 2016) (holding that a district court's failure to comply with rule 32.2 was harmless where the defendant received notice the government would seek forfeiture and had the opportunity to contest forfeiture); *cf.* Fed. R. Crim. P. 7(c)(2) (providing that "neither

an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction" unless "the defendant was misled and thereby prejudiced").

In response, Javat cites *United States v. Annabi*, 746 F.3d 83 (2d Cir. 2014). There, the government cited the wrong forfeiture statute in the defendant's indictment and never invoked the correct forfeiture statute before sentencing. *See id.* at 85–86. The Second Circuit held that "where the [g]overnment fails to invoke an applicable forfeiture [statute] in the indictment, and fails to correct that error prior to entry of a final judgment, forfeiture must be limited to that authorized by the statute cited as the basis for forfeiture, and of which the defendant had notice." *Id.* at 86. But here, unlike in *Annabi*, the government invoked the correct forfeiture statute before sentencing and Javat had ample notice that the government intended to pursue forfeiture under section 981(a)(1)(C). So any error was harmless.

### B.    *The Incorporation of Forfeiture Orders into Javat's Criminal Judgment*

Second, Javat argues that the district court violated rule 32.2(b)(4)(B) by not adequately incorporating its forfeiture orders into his criminal judgment.

### 1.    <u>Background</u>

Javat's initial criminal judgment ordered "[f]orfeiture of the defendant's right, title and interest in certain property" and directed "[t]he [g]overment [to] file a preliminary order of forfeiture

within [three] days." After receiving evidence and hearing argument on forfeiture at Javat's sentencing hearing, the district court again informed Javat that it was "order[ing] forfeiture." It then entered a preliminary order of forfeiture against him and ordered him to forfeit $26,272,279.45 as proceeds of the fraud. The district court issued a first amended criminal judgment that again ordered "[f]orfeiture of the defendant's right, title and interest in certain property" and that "[t]he [g]overnment shall file a preliminary order of forfeiture within [three] days." Javat's final criminal judgment contained the same forfeiture language.

### 2.    Analysis

Rule 32(b)(4)(B) provides that the district court "must . . . include the forfeiture order, directly or by reference, in the judgment." Fed. R. Crim. P. 32.2(b)(4)(B). "[B]ut the court's failure to do so may be corrected at any time under [r]ule 36." *Id.* That is, "[a]fter giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." Fed. R. Crim. P. 36.

Here, the district court's judgment complied with rule 32.2(b)(4)(B). The judgment ordered Javat to forfeit his "right, title and interest in certain property." And by directing the government to file the preliminary forfeiture order, the judgment incorporated the preliminary forfeiture order by reference.

Still, even if this incorporation wasn't enough, rule 32.2 confirms that any failure to include the forfeiture order in the

judgment "may be corrected at any time under [r]ule 36." Fed. R. Crim. P. 32.2(b)(4)(B). Out of an abundance of caution, that's what we'll order the district court to do. We'll remand this case to the district court to amend Javat's judgment to either specifically include the forfeited property or to explicitly reference the preliminary order of forfeiture. *See, e.g.*, *United States v. Dahda*, 852 F.3d 1282, 1298 (10th Cir. 2017) ("In sum, the failure to state the forfeiture amount in the judgment does not warrant vacatur of the forfeiture. But we call the oversight to the attention of the district court so that it may correct the judgment.").

Javat argues that our decision in *United States v. Pease*, 331 F.3d 809 (11th Cir. 2003), does not allow the judgment to be corrected, but his reliance on *Pease* is misplaced. In that case, we said, "the district court [had an] obligation to include an order of forfeiture in its judgment *if* forfeiture to the United States is to come to fruition" and that the failure to include an order of forfeiture in a criminal judgment was not a clerical mistake correctable through rule 36. *Id.* at 813, 816. But *Pease* relied on the predecessor to rule 32.2, and rule 32.2 now clarifies that any omission is a correctible clerical mistake under rule 36. *See id.* at 810 n.1; *see also* Fed. R. Crim. P. 32.2(b)(4)(B).

## C.    *The Proceeds' Traceability*

Third, Javat argues that the district court erred in ordering him to forfeit $26,272,279.45 because some of the proceeds captured in that amount were traceable to James Sipprell, one of

Javat's coconspirators, and International Medical Distributors, Inc., which Sipprell owned.

### 1.    Background

The district court held a forfeiture hearing and considered whether the entire proceeds of the fraudulent scheme could be traced to Javat.  At the hearing, Javat argued that the proceeds could not be traced entirely to him because the evidence showed that Sipprell operated International Medical Distributors, which obtained at least some of the proceeds.  The government responded with evidence that Javat controlled Sipprell and International Medical Distributors.  Based on this evidence, the district court agreed with the government that Javat controlled Sipprell and International Medical Distributors, and was, thus, jointly responsible for the proceeds those companies received.

After the hearing, the district court entered an order in which it confirmed that Javat's "net income from the diversion scheme during the wire fraud conspiracy period[] was $26,272,279.45" and that this amount was "traceable to [Javat's] offense."  The district court came to this amount using the accounting records from Soto's trial, which it also used to calculate the loss amount.

### 2.    Analysis

The district court did not err in calculating the forfeiture amount because the evidence showed that the proceeds of the scheme were traceable to Javat.  Section 981(a)(1)(C) requires

forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" a conspiracy to commit wire fraud.  18 U.S.C. § 981(a)(1)(C); *id.* § 1957(c)(7); *id.* § 1961(1).  "In cases involving lawful goods . . . that are sold . . . in an illegal manner, the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture . . . ."  *Id.* § 981(a)(2)(B).

In *Honeycutt, v. United States*, 581 U.S. 443 (2017), the Supreme Court reviewed a forfeiture order based on a different statute, 21 U.S.C. section 853, which order required the defendant to forfeit property that was acquired solely by his coconspirator.  The Court held that the order was unlawful because "the language and structure of 21 U.S.C. [section] 853 . . . limited forfeiture to 'property the defendant himself actually acquired as a result of the crime.'"  *United States v. Goldstein*, 989 F.3d 1178, 1203 (11th Cir. 2021) (quoting *Honeycutt*, 581 U.S. at 454).  Accordingly, "when a court orders forfeiture under [section] 853, it may not hold a defendant 'jointly and severally liable for property that his coconspirator derived from the crime but that the defendant himself did not acquire.'"  *Id.* (quoting *Honeycutt*, 581 U.S. at 445).

Afterward, in *Goldstein*, we reviewed a district court's forfeiture order under section 981(a)(1)(C).  *Id.* at 1202–04.  There, the district court ordered a defendant to forfeit property acquired jointly with a coconspirator.  *Id.*  The defendant argued that the order violated *Honeycutt*, but we rejected that argument.  *Id.*  We first "expressed doubt that [*Honeycutt*] equally applie[d] to 18 U.S.C.

[section] 981(a)(1)(C)." *See id.* at 1203 n.8. And even if it did, we said the district court's forfeiture order was lawful under *Honeycutt* because the property forfeited was "jointly acquired," unlike the property in *Honeycutt* which was acquired by a coconspirator "alone." *Id.* at 1203. In other words, we concluded that *Honeycutt* only bars forfeiture of property that a coconspirator acquires "alone," not "jointly acquired" property. *Id.*

We reach the same conclusion here. Assuming *Honeycutt* applies to section 981(a)(1)(C), the district court's $26,272,279.45 forfeiture order was lawful because the proceeds traceable to Sipprell and International Medical Distributors were "jointly acquired" by Javat. *See id.* at 1203, 1203 n.8. The evidence from the forfeiture proceedings showed that Javat employed Sipprell and controlled International Medical Distributors. For example, the indictment alleged that Javat was the chairman of the wholesaling company, Uniworld Group, and International Medical Distributors was Uniworld's United States affiliate.

At Javat's sentencing hearing, the government presented an email in which Javat described Sipprell as "the [p]resident of [Javat's] company in" the United States. It also presented an organizational chart that identified Javat as the "[c]hairman" of Uniworld at the peak of the chart, with Sipprell under him. Another document listed International Medical Distributors as an "Associate Compan[y]" under "Uniworld['s] Group of Companies." And another one identified that Uniworld owned the Georgia warehouse where International Medical Distributors operated.

Finally, at the forfeiture hearing, the government presented an email in which Javat made "very clear" that Sipprell was "holding . . . companies under trust for" Javat and that Sipprell "work[ed] for Uniworld, and [Javat paid him] a salary." In another email, Javat told Sipprell to "[s]top . . . annoying" him because he "pa[id Sipprell's] salary." And in a third email, Javat wrote Sipprell: "When I tell you to do something, . . . just do it." Based on this evidence, the district court did not clearly err in determining that the forfeiture amount was traceable to Javat.[16]

### D.    Javat's Money Judgment

Fourth, Javat argues that his money judgment for the forfeiture amount violated rule 32.2(a) because the superseding indictment failed to provide him notice that the government would seek a money judgment.

### 1.    Background

Before the district court entered its forfeiture order, the government moved for a money judgment against Javat for the forfeiture amount. Javat objected on two grounds. First, he argued that granting the government a money judgment would violate

---

[16] Javat also argues, for the first time in his reply brief, that the district court erred in relying on the accounting records to calculate the forfeiture amount. This argument is forfeited. *See United States v. Evans*, 473 F.3d 1115, 1120 (11th Cir. 2006) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court." (citation modified)). Even if it were not, the argument fails because the internal accounting records were sufficiently reliable to make a finding on the forfeiture amount.

rule 32.2 because neither the original nor the superseding indictment gave him notice that the government would seek a money judgment. Second, he contended that money judgments were not statutorily authorized and were therefore invalid. The district court overruled his objections, and, as part of its forfeiture order, entered a money judgment against Javat for $26,272,279.45—the same amount as the forfeiture order.

## 2.    Analysis

Rule 32.2(a) requires the government to provide notice in the indictment that it will seek forfeiture. *See* Fed. R. Crim P. 32.2(a). But it explicitly provides that "[t]he indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." *Id.* Nothing in rule 32.2(a) requires the government to allege it will seek a money judgment. *See United States v. Lo*, 839 F.3d 777, 791 (9th Cir. 2016) ("The government is not legally required to notify a defendant that it is seeking a money judgment . . . .").

Even so, Javat asserts that the district court's money judgment was invalid because money judgments are not statutorily authorized in criminal cases. But we have repeatedly said that money judgments are statutorily authorized. *See Waked Hatum*, 969 F.3d at 1163–64; *see also Farias*, 836 F.3d at 1331 (noting that "[s]ection 981(a)(1)(C) authorized a forfeiture money judgment"). We say so again here.

Second, Javat contends that the district court's money judgment violated rule 32.2(b)(4)(B) because the final criminal judgment did not reference the money judgment.  But that rule only requires that the criminal judgment incorporate "the forfeiture order, directly or by reference," not the money judgment.  *See* Fed. R. Crim. P. 32.2(b)(4)(B).  Even if more was required, the issue can be corrected by amending the judgment on remand.  *See id.*; *see also* Fed. R. Crim. P. 36.  Since we are already remanding the case to the district court to amend its judgment to incorporate the forfeiture order, we will also direct it to incorporate the money judgment out of an abundance of caution.

### E.    *Calh And Pennco's Challenge*

Finally, Calh and Pennco appeal the district court's final forfeiture order and the dismissal of their petitions to contest the forfeiture in ancillary proceedings for lack of standing.[17]

### 1.    Background

After the district court entered the forfeiture order and money judgment, the government moved for an order forfeiting substitute property to satisfy the money judgment.  Specifically, the government sought substitute forfeiture of the Georgia warehouse and the Washington condominium.  Javat had already said

---

[17] "We review de novo questions about our subject matter jurisdiction, including standing." *United States v. Cone*, 627 F.3d 1356, 1358 (11th Cir. 2010) (citation modified).

at his bond hearing that he had an interest in these properties and offered them as collateral for his bond.  Javat opposed the motion.

Then, Calh and Pennco moved to intervene to oppose the substitute asset forfeiture because Calh held legal title to the warehouse and Pennco held legal title to the condominium.  The district court concluded that the bond-hearing evidence was enough to establish that Javat "potentially" had an interest in the properties, granted the government's motion for a preliminary order forfeiting Javat's interest in the substitute properties, and denied Calh and Pennco's joint motion to intervene after finding that ancillary proceedings were the correct vehicle for them to assert their interests in the properties.  It entered a preliminary order of forfeiture as to the two properties.

Javat, Calh, and Pennco appealed the orders forfeiting Javat's interest in the property and denying Calh and Pennco's motion to intervene.  *See United States v. Javat*, No. 20-13310, 2022 WL 703940, at *1 (11th Cir. Mar. 9, 2022).  Javat argued that the district court lacked jurisdiction to order forfeiture in the properties because the order only said he "potentially" had an interest in them, not that he actually held an interest in them.  *Id.* at *4.  He also argued that the district court lacked jurisdiction over the properties because they were located outside Florida.  *Id.* at *5.  Calh and Pennco argued that the district court violated their due process rights by denying their motion to intervene.  *Id.* at *2.

We rejected their arguments.  *Id.* at *2–5.  As to Javat, we explained that the district court's finding that Javat held a potential

interest in the properties was sufficient and that the district court had jurisdiction over the out-of-state properties under 18 U.S.C. section 853(l). *Id.* at ⋆5. As to Calh and Pennco, we concluded that the district court did not violate their due process rights because the preliminary forfeiture order did not affect their property interests and that they had the right to file petitions in ancillary proceedings before the properties were finally forfeited. *Id.* at ⋆3.

That's what Calh and Pennco did. They filed petitions to contest the forfeiture in ancillary proceedings. At a hearing on the petitions, the government presented evidence that Javat controlled Calh and Pennco and the companies acted as straw owners on Javat's behalf.

Based on this evidence, the district court concluded that Calh and Pennco were straw owners that held the properties for Javat. Because straw owners who merely hold legal title on another's behalf lack standing to file ancillary petitions challenging the forfeiture, the district court dismissed the petitions for lack of jurisdiction. After resolving the petitions, the district court entered a final forfeiture order.

### 2.    Analysis

The district did not err by dismissing Calh's and Pennco's petitions because it correctly concluded that they lacked standing to challenge the properties' forfeiture. Article III limits the jurisdiction of the federal courts to "[c]ases" and "[c]ontroversies." U.S. Const. Art. III., § 2, cl. 1. A party's standing to challenge an action "go[es] to the heart of the Article III case or controversy

requirement." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011) (quotation omitted).  Standing, thus, "is a threshold matter required for a claim to be considered by the federal courts." *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262 (11th Cir. 2006) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

Standing requires "(1) an actual (or imminent), concrete, and particularized injury in fact (2) that is fairly traceable to the defendant's challenged action and (3) that is likely redressable by a favorable decision." *In re Breland*, 989 F.3d 919, 922 (11th Cir. 2021) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)).  When property has been seized, evidence that the petitioner owns the property provides some direct evidence to meet the first element.  *See Via Mat*, 446 F.3d at 1262.  But standing ultimately relies on "the existence of an injury, not ownership." *Id.* So evidence of ownership alone is not dispositive because "'straw owners' and persons who might have unknowingly been in possession of property that is seized do not necessarily suffer an injury that is sufficient to demonstrate standing." *Id.* at 1262 n.5 (citing *United States v. Cambio Exacto*, 166 F.3d 522, 527–28 (2d Cir. 1999)).

Indeed, we've explained that "possession of bare legal title by one who does not exercise dominion and control over the property is insufficient . . . to establish standing to challenge a forfeiture." *United States v. 900 Rio Vista Blvd.*, 803 F.2d 625, 630 (11th Cir. 1986).  When determining whether a title owner has suffered an Article III injury from the seizure of property, district courts

must "look behind the formal title to determine whether the record title owner is a 'strawman' set up to conceal the financial affairs or illegal dealings of someone else." *Id.* (citation modified).

Here, the district court's finding that Calh and Pennco were straw owners who "possess[ed] . . . bare legal title," *id.*, to the properties was supported by the evidence. As to Calh, the government presented evidence showing that Javat wholly owned it in 2008 when the company bought the warehouse. Eventually, in 2018, Javat formed Calh Trust and told the trustee to "take into account [his] expressed wishes regarding the administration of the trust" and operate the trust "for [his] benefit" during his lifetime. Later that year, Javat transferred his Calh shares to the Calh Trust.

As to Pennco, the government presented evidence that Javat initially put in an all-cash offer to purchase the property in his wife's name. But he changed course and had Pennco buy the condominium instead. Pennco's director—Sipprell, who also happened to be Javat's employee—said he signed on Pennco's behalf to purchase the condominium "for Javat." At the time, multiple emails showed that Pennco did not have its own separate bank account. Also, Pennco's only member was Pennco Trust, which Javat established in 2016. When he created this trust, he directed the trustee to operate the trust for his benefit and identified himself as the sole beneficiary for the trust. Plus, a "[l]ocal [r]epresentation [a]greement"—executed on Pennco's behalf a day after the trust was formed—identified Javat as Pennco's "ultimate beneficial owner." This evidence was sufficient to show that Calh and Pennco were

straw owners of the properties for Javat, which meant that the companies lacked standing to challenge the properties' forfeiture.[18] *See id.*

Calh and Pennco challenge the dismissal of their petitions for lack of standing on three other grounds. First, citing *United States v. Gilbert*, 244 F.3d 888 (11th Cir. 2001), they argue the district court erred in finding they were straw owners for Javat during the ancillary proceedings because that finding conflicted with the district court's preliminary forfeiture order that said Javat "potentially" had an interest in the properties. But *Gilbert* is inapposite. *See id.* at 917. There, the district court made conflicting findings of fact; it found that a party owned a forfeitable interest in the subject property but later found that the same party was a mere straw owner without a forfeitable interest in the property. *See id.* That's not what happened here because the district court did not make a factual finding about Calh's and Pennco's ownership in its preliminary forfeiture order and, thus, there were no conflicting factual findings.

_____

[18] Calh and Pennco also challenge the district court's jurisdiction to proceed with the ancillary proceedings, arguing—like Javat did on his appeal—that the preliminary forfeiture order's statement that Javat "potentially" had an interest in the properties was insufficient to grant the district court jurisdiction. But because "[a]n ancillary proceeding constitutes the sole means by which a third-party claimant can establish entitlement to return of forfeited property," third parties "lack[] standing to challenge the validity of the [preliminary order of forfeiture]'s determination of forfeitability." *United States v. Davenport*, 668 F.3d 1316, 1321 (11th Cir. 2012). Since Calh and Pennco are third parties, they do not have standing to challenge the preliminary forfeiture order. *See id.*

Second, Calh and Pennco argue that, in order to determine whether they were straw owners for standing purposes, the district court was required to apply state law to pierce the corporate veil. But "standing in federal court is a question of federal law, not state law." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013). And whether Calh or Pennco can be held liable under state corporate law by piercing the corporate veil is irrelevant to whether they suffered a constitutionally cognizable injury sufficient to confer standing as a matter of federal law. *Cf. Via Mat*, 446 F.3d at 1262 ("At the heart of Article III standing is the existence of an injury, not ownership."). That's why we and our sister circuits have often assessed whether straw owners had Article III standing without reference to state law. *See 900 Rio Vista Blvd.*, 803 F.2d at 630 (affirming straw-owner finding with no reference to state law); *United States v. 500 Delaware St.*, 113 F.3d 310, 312 (2d Cir. 1997) (same); *United States v. Contents of Accts. Nos. 3034504504 & 144-07143 at Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 971 F.2d 974, 985 (3d Cir. 1992) (same).

Third, Calh and Pennco contend that the district court misapplied the "relation back doctrine" when it considered facts related to ownership before the preliminary forfeiture order. But the district court did not apply that inapplicable doctrine. "The relation-back doctrine operates retroactively to vest title in the government effective as of the time of the act giving rise to the forfeiture." *United States v. Bailey*, 419 F.3d 1208, 1213 (11th Cir. 2005) (citation modified). It does not mean, as Calh and Pennco imply, that a court cannot look to pre-forfeiture facts in determining whether an entity is a straw owner. *See, e.g.*, *United States v. Carrell*, 252 F.3d

19-15168               Opinion of the Court                81

1193, 1204–05 (11th Cir. 2001) (looking to what the purported owner of the property knew years before the government seized the property). The district court therefore correctly concluded that Calh and Pennco did not have standing to contest the forfeiture proceedings.[19]

## CONCLUSION

For these reasons, we affirm Javat's and Soto's convictions and sentences, as well as the district court's restitution and forfeiture orders. But we remand for the limited purpose of correcting

---

[19] In a single sentence, citing no authority, Javat also purports to challenge the substitute asset forfeiture order, arguing that: "(i) a defendant must own property to suffer its forfeiture and none was proven; (ii) substitute asset forfeiture is predicated upon a valid prior forfeiture judgment and there is none here; (iii) without an identified forfeited res, a defendant cannot take any 'act or omission' to dissipate it[;] . . . and (iv) assuming a money judgment was impliedly imposed, money judgments are not among the five types of substitute forfeiture listed . . . and cannot be dissipated by act of a defendant or otherwise." Javat did not raise these arguments in his earlier appeal challenging the substitute forfeiture judgment. *See Maldonado v. U.S. Att'y. Gen.*, 664 F.3d 1369, 1375 (11th Cir. 2011) ("It is by now hornbook law that the doctrine of res judicata 'bars the filing of claims which were raised or could have been raised in an earlier proceeding.'" (quoting *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir.1999))). But even assuming these new arguments aren't barred by the earlier appeal, they aren't properly before us given Javat's passing reference to these issues. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

clerical errors in Javat's criminal judgment to incorporate the forfeiture orders and money judgment.

**AFFIRMED AND REMANDED WITH DIRECTIONS.**